JUPITER MINING CO. *v.* BODIE CONSOLIDATED MINING CO.

*(Circuit Court, D. California.   March 12, 1881.)*

1. LENGTH AND WIDTH OF LODE CLAIMS.

The act of congress of May 10, 1872, authorizes a claim to be located 1,500 feet in length along the vein, and, in the absence of any local rule or custom, the width of such claim may extend 300 feet on each side of the middle of the vein; but said act of congress, by implication, authorizes the miners to limit the width of such claims to 25 feet on each side of the middle of the vein.

2. MINERS' RULES MUST BE IN FORCE.

To be of any validity, a rule or custom of miners must not only be established or enacted, but must be *in force* at the time and place of the location. It ceases to be operative whenever it falls into disuse, or is generally disregarded.

3. MUST NOT CONFLICT.

The rules and customs of miners must not conflict with the laws of the United States, or the laws of the state in which the claims are located.

4. STILL IN FORCE.

Section 748 of the Code of Civil Procedure of California is still in force, except so far as it is limited by act of congress; and no distinction is made by this provision of the state statute between a custom or usage proved by parol evidence and a rule adopted by a miners' meeting and recorded in writing.

5. QUESTION OF FACT.

Whether or not a mining law or custom is in force at any given time is a question of fact; but, when shown to have been in force, the presumption is that it continues in force until the contrary is proved.

6. VOID FOR EXCESS OF WIDTH.

Where a location, otherwise valid, exceeds the width allowed by law, it is void as to the excess, but valid as to the extent allowed by law.

7. DISCOVERY OF A VEIN.

No rights can be acquired under the statute by location before the discovery of a vein or lode within the limits of the claim located.

8. DEFINITION OF VEIN OR LODE.

A vein or lode authorized to be located is a seam or fissure in the earth's crust filled with quartz or some other kind of rock, in place, carrying gold, silver, or other valuable mineral deposits named in the statute.   It may be very thin, or many feet thick, or irregular in thickness; and it may be rich or poor, provided it contains any of the metals named in the statute.   But it must be more than detached pieces of quartz or mere bunches of quartz not in place.

9. DISCOVERY OF VEIN AFTER LOCATION.

A location is made valid by the discovery of a vein or lode at any time after the location, provided that such discovery is made before any rights are acquired in the same claim by other persons.

10. FIRST DISCOVERER.

It is not necessary that the locator should be the first discoverer of the vein; but it must be known and claimed by him in order to give validity to his location.

11. OTHER VEINS THAN THOSE DISCOVERED.

Where a valid location is made upon a vein or lode discovered, the locator is not only entitled to the vein discovered, but to every other vein and lode

throughout its entire depth, the top or apex of which lies within the surface lines of the claim extended vertically downwards, to which no right had attached in favor of other parties at the time the location became valid, although such veins or lodes may so far depart from a perpendicular as to extend outside of the vertical side lines.

## 12. How Location to be Marked.

A location of a mining claim must be distinctly marked on the ground so that its *boundaries* can be readily traced; but the law does not define or prescribe what kind of marks shall be made, or upon what part of the ground or claim they shall be placed. Any marking on the ground claimed, by stakes, mounds, and written notices, whereby the *boundaries* can be readily traced, is sufficient.

## 13. Right of Subsequent Locator to Object.

A subsequent locator has no right to object that the first location was not sufficiently marked on the ground at the time of the location or before recording, provided that such first location was sufficiently marked on the ground before any valid subsequent location of the same claim.

## 14. Obliteration of Marks.

After a location has been lawfully made, the right of the locator cannot be divested by the mere obliteration of the marks or removal of the stakes without his fault, he having performed the other acts required by the statute.

## 15. As to Record.

The law of congress requires no record of a mining claim except in obedience to valid local rules or customs of miners; but when such local rules or customs require a record it must contain the names of the locators, the date of the location, and such a description of the claim, by reference to some natural object or permanent monument, as will identify the claim. But such natural objects or permanent monuments are not required to be on the ground located, although they may be; and the natural object may consist of any fixed natural object, and such permanent monument may consist of a prominent post or stake firmly planted in the ground or of a shaft sunk in the ground. If by reference to any such natural object or permanent monument the claim recorded can be identified with reasonable certainty, the record will be sufficient in this particular, otherwise not.

## 16. Object and Effect of Record.

The object of recording mining claims is to give notice to others desiring to locate in the vicinity. The language of the act of congress authorizing miners to make regulations "governing the location and manner of recording," implies that the act of location is distinct from that of recording, except where the regulations of miners make recording necessary to constitute a location; so that a location may be complete and vest the exclusive right of possession before any record thereof is made, unless recording is made an act of location, or one of the acts necessary to constitute a location, by miners' rules or regulations.

## 17. Forfeiture by Failure to Record.

The right to a mining claim will not be forfeited by a failure to record the same, in the absence of a miners' rule or regulation providing for a forfeiture on that ground.

## 18. Effect of Actual Notice.

In the absence of any miners' rule or regulation making recording a necessary act or condition of a complete location, or providing for a forfeiture by failure to record, a prior location of a mining claim, without recording the

same, gives the locator thereof the exclusive right to possess and enjoy the same as against all persons having actual notice of such location and the extent thereof.

19. WORK NECESSARY TO HOLD A CLAIM.

The statute requires $100 worth of work on each claim located after May 10, 1872, in each year, and, in default thereof, authorizes the claim to be relocated by other parties, provided the first locator has not resumed work upon it. But if the first locator resumes work at any time after the expiration of the year and before any relocation is made, he thereby preserves his claim. The statute nowhere authorizes a trespass upon, or a relocation of, a claim before located by another, however derelict in performing the required work the first locator may have been, provided he has returned and resumed work, and is actually engaged in developing his claim at the time the second locator enters and attempts to secure the claim.

20. WORK TO HOLD ADJOINING CLAIMS.

Where one person or company owns several contiguous claims capable of being advantageously worked together, one general system may be adopted to work such claims; and work done according to such system for the purpose of prospecting or working all such contiguous claims, although done on only one of such claims, or even outside of all of them, is available to hold all such contiguous claims intended to be worked or prospected by such general system.

This was an action in the nature of an action of trespass upon a lode mining claim in the Bodie mining district, California, in which the defendant pleaded title to the *locus in quo*. The case was removed from the state court to the circuit court of the United States, where it was tried by a jury.

*Garber, Thornton & Bishop* and *Robert M. Clark,* for plaintiff.

*Stewart, Vanclief & Herrin* and *P. Reddy,* for defendant.

SAWYER, C. J., (*charging jury.*) Counsel having ably discharged their duty, it now devolves on the court to state to you the law governing this case, and then it will be your duty and your province to determine the facts. The questions of fact are for you alone to determine; the weight to be given to the evidence, the credit to be given to the witnesses, and everything relating to a disputed question of fact, is for your sole consideration and determination.

If I state the testimony I shall only do it for the purpose of calling your attention to it and stating its tendency, but I shall not go over it fully. If I intimate an opinion on a disputed question of fact you are not to be governed by it unless it corresponds with your own ideas as to what the facts are. If I make a mistake in stating the testimony, or alluding to a fact, you will correct it by your own recollection and judgment. I do not intend to express an opinion on the disputed questions of fact, or where the testimony is in conflict. I shall state to you the law which governs this case, and it is your duty to take the law from the court.

You will examine the testimony calmly, carefully, and impartially, and announce the result by your verdict.

First in the order of proceedings we would naturally consider the questions that arise on the plaintiff's title. I do not understand the defendant to insist that the plaintiff has not made out a *prima facie* title to the ground covered by its claims, now known as the Jupiter Company's ground, embracing the four claims—the Savage, the East Savage, the Riordan, and the Daley. It does claim, however, by its own evidence, to overthrow that title by showing a title in itself prior to and superior to that title. *Prima facie* I do not understand the defendant to claim that plaintiff has not shown its title to these claims; but the question that arises on its title is, is the point on the Actæon vein where the acts complained of were committed within the claims of the plaintiff? Does the plaintiff own the lead at the point where the acts complained of were performed? If it does not, then it has no title to the vein worked upon, and it is not injured by the act of the defendant, and your verdict must be for the defendant, whether the defendant has shown title to the vein in question or not. Unless the plaintiff has title to that vein it cannot recover in this action. That point, therefore, is an important one for you to determine; and it is the first question in logical order that arises in this case.

It will be convenient for you to dispose of this first. I will, therefore, first call your attention to it. If you find that point against the plaintiff it will be unnecessary for you to go further. In order that the plaintiff should be the owner of the Actæon vein it must be one of the veins or ledges which was located in one of plaintiff's four claims, or it must have its top or apex within the side lines of some one of its claims, drawn vertically downwards.

The first question then is, is it one of the ledges which plaintiff's grantors located? The point where the acts complained of were performed is here (pointing on the model)—from this point downwards in what has been termed—and the name may be used to designate the place here—the Actæon ledge. The plaintiff insists on two positions—*First*, that it is the lode which its grantors located in the Savage, and which claim was located on this lode here, which plaintiff's counsel says, according to the strike of the lode, runs somewhere in this direction. The plaintiff does not locate it on or claim that it was any other lode than that, I believe. Then is it identical with the lode which was located in the Savage claim? Now, this is known to have been exposed, and is seen only in these two places. That

fact, in connection with the other facts in relation to the formation of the country rock around here, and the other surrounding facts, is the fact from which you must determine that question—whether it is or is not that lode. It is insisted on the part of the defendant that this is a mere spur or offshoot of the Fortuna lode. If it is not such a spur or offshoot, then it insists that it is an independent lode, wholly disconnected from any of the other lodes.

Now, gentlemen, if that is only an offshoot or spur of the Fortuna lode, in such a way as to be simply part of that lode, then the plaintiff has no title to it, and it claims none. It disclaims any title to the Fortuna lode.

It is for you to determine from the testimony whether it is part of the Fortuna lode, or whether it is an independent lode, or if it is a part of the Savage lode. If it is a part of that lode in the Savage which plaintiff located, then, if the plaintiff has title to the Savage, it has title to that vein. If it has not title to the Savage, it has not a title to the lode through the Savage; or if it is not a part of that lode, then plaintiff has no title to it on that ground.

The next question is, if it is not a part of that lode, then has it its top or apex within the side lines of any one of the plaintiff's claims drawn vertically downwards? Because if it has, and plaintiff has a valid title to that claim, then it is plaintiff's property. If it has not its apex within the side lines of any of plaintiff's claims drawn vertically downwards, and is not one of the lodes which the plaintiff actually located, then it has no title to it.

Those are the questions of fact for you to determine on this branch of the case. You have heard the testimony, and the comments of counsel on it, and upon the testimony you must determine the questions. It is insisted by the defendant, if this vein is not a spur or offshoot of the Fortuna lode, that then it is an independent lode; and the plaintiff insists, if it is an independent lode, that it has its top or apex within one of its claims; and the defendant insists that the top or apex is outside of the plaintiff's claims.

If it is an independent lode the question is, in what direction on the dip does it run, and where is its apex or top? Mr. Anderson and Mr. Whiting testified that at this point here, with a mathematical instrument made and used for that purpose, they measured the angles of the dip, and, according to their measurement and their testimony, the dip would carry it some distance outside of the Daley claim, supposing it to run in that direction to the surface. If it is an independent lode, and has its top or apex outside of the Daley

claim, then it does not belong to the plaintiff.    If it is inside of the Daley, if it has its top or apex inside of the Daley or Savage, it does belong to the plaintiff if they have the better title to those claims.

Professor Jenny and Mr. Holmes, on the contrary, testified that they put a plumb-line on the vein, although they do not profess to have measured the angle, and they say it is nearly perpendicular; and, supposing it to go in that direction to the surface, it would come very near to the Daley line and a little inside.    Where the top or apex is, is for you to determine.    The plaintiff claims that, owing to the formation of the country rock, the probability is the vein runs to this point, and then turns off and runs into the Savage.    The plaintiff's theory, as I understand the testimony, is that here are two different formations.    This formation to the eastward is a secondary formation; this to the westward is the primary, (pointing to the map.)    That the line of stratification runs in different directions in the two formations there.    That is claimed to be secondary, (pointing.)    If you believe that theory as to the formation of the rock here, and believe that the lodes found outside or to the eastward of this blue clay stratum run in this direction, and the stratification there in the same direction dipping to the west, and the leads and stratification to the westward, in this direction, dipping to the east, then it will be a question of probabilities for you to determine whether or not this Actæon lode passes up and crosses over the blue clay stratum into the other formation, thence following its line of stratification to the surface, or is it more likely to have pursued its course in its own formation, following the line of its stratification, as this Fortuna vein has apparently done here on the same side of the stratum of blue clay?    This Fortuna vein, it would seem, follows its own formation and line of stratification throughout.    You are entitled to consider the probability—if these are different formations, as they say—the probability whether the Actæon vein would run in that direction and pass out here into another formation, or whether it would be confined to the formation in which it is found and to which it properly belongs.    I can give you no further aid on that question.    You must take the testimony as you find it, and view it with a candid and impartial spirit, and give such determination to the question as you think all the facts and circumstances in the case justify.    If, then, the Actæon vein is not one of the lodes located by plaintiff; if it has not its top or apex within the side lines of any one of the claims of plaintiff drawn vertically downwards,—then it is not the plaintiff's lode, and you will have to find for the defendant,

whether the defendent owns it or not. If you find for the defendant on that proposition, that disposes of the case, and there is no necessity to spend any further time on the other points of the case. If you find for the plaintiff, however, on that issue, that the Actæon is the lode that the plaintiff has located there in the Savage, or has its top or apex within the side lines of any one of the claims that the plaintiff owns drawn vertically downwards, it will be necessary for you to consider the defendant's title—whether the defendant has an anterior and a superior title; otherwise it will not be necessary to look at its title. I will say, with reference to this branch of the case, that the plaintiff alleges this to be its lode. It devolves upon plaintiff, therefore, to show affirmatively to you that it is entitled to that lode. The burden of proof is on the plaintiff. If it fails to show it, or if the testimony is equally balanced, then you must find for the defendant, because plaintiff must show by a preponderance of testimony that the lode is within its claim. If it fails on that, your verdict must be for the defendant.

If you find for the plaintiff on that point, as I said before, it will be necessary to consider the defendant's title. I will say with reference to the defendant, as I said with reference to the plaintiff, when you come to the defendant's title the burden of proof is on the defendant. It devolves on it in the same way, by preponderance of evidence, to show that its title is anterior and superior to that of the plaintiff.

Now, gentlemen, in order that you may know whether the defendant has a title or not, it will be necessary for you to be informed what it is necessary to do in order to secure a title to a mining claim.

By an act of congress which took effect May 10, 1872, all valuable mineral deposits in lands belonging to the United States were declared to be free and open to exploration and purchase, under regulations prescribed by law and according to the local customs or rules of miners in the several districts, so far as applicable and not inconsistent with the laws of the United States.

The location under which defendant especially claims was made since May 10, 1872, and at the time it was made the statute of the United States authorized a claim to be 1,500 feet in length along the vein or lode, and it was provided that no claim "shall extend more than 300 feet on each side of the middle of the vein at the surface; nor shall any claim be limited by any mining regulation to less than 25 feet on each side of the middle of the vein at the surface."

In the absence, then, of any mining rule or custom *in force* at the time of the location at the place where it is made, the location may extend to the distance of 300 feet on each side of the middle of the vein at the surface; that is to say, the claim may be 1,500 feet in length along the vein by 600 feet wide, including 300 feet on each side of the middle of the vein.

As I construe the statute, however, and so instruct you, by implication, the miners, by a rule, regulation, or custom established and in force at the time and place of the location, may limit the width of the claim to 25 feet on each side of the middle of the vein at the surface. But such limitation to 25 feet on each side, to be valid, must be by virtue of a rule, regulation, or custom which has not only been established, but which is actually in force at the time of the location.

The regulation must be in accordance and not in conflict with the laws of the United States and of the state of California; and the laws of California provide that "in actions respecting mining claims proof must be admitted of the customs, usages, or regulations established and *in force* at the bar or diggings embracing such claim, and such customs, usages, or regulations, when not in conflict with the laws of this state, must govern the decision of the action." This provision is still in force, except so far as its operation is limited by the act of congress.

The Lucky Jack location, under which defendant claims, was made May 26, 1875, and the claim was located 300 feet wide on each side of the lode, in pursuance of the act of congress allowing such location.

It is claimed by the plaintiff that there was at the time of the location a regulation in force in that district limiting the claim to 50 feet on each side of the vein, and that the location of 300 feet is therefore void. Now, whether there was or not such a regulation or custom *in force* at the time, is a question of fact to be found by the jury from all of the evidence in the case on that point.

The plaintiff, to show a regulation limiting the location to 50 feet on each side, introduced the minutes of proceedings of a miners' meeting in the district, held July 10, 1860, in which there is a rule making such limitation, and minutes of meetings held at various times subsequently, amending the rules, but continuing this rule in force down to and including November 13, 1867, at which time the last action in respect to modifying the rules and regulations was had till

December 30, 1876, which is a year and seven months after said location, and nine years after any meeting amending said rules.

The defendant, to meet this testimony, introduced in evidence the mining records of the district, from which it appears that no miners' meeting was held, and no mining recorder was elected from July 3, 1869, till October 9, 1875,—more than six years,—and that from and including the year 1872, when the act of congress referred to took effect, and thenceforth down to the year 1875, only one quartz location was made in the district,—there being none after the passage of the act of congress in 1872, one in 1873 in which no width was specified, and none in the year 1874; that during the year 1875 eleven quartz locations were made, of which nine were made 300 feet on each side of the lode, and purported to have been made in pursuance of said act of congress, and two only of 50 feet wide on each side, one of which two was marked on the record as abandoned, and during the year 1876 twenty-five locations appear to have been made, of which five were 600 feet wide; one, an extension of a 600 feet claim, having no width mentioned, and the others 50 feet wide on each side. From this it is argued by the defendant that quartz mining in the district, so far as new locations are concerned, was practically abandoned for several years, and no laws on the subject of new locations were practically in force; that on the return of the miners, and the revival of mining in 1875, the act of congress had been passed, and the miners regarded that act as superseding the old laws on this point, and as authorizing the location of quartz claims 300 feet wide on each side, and in practice adopted and generally acquiesced in that rule during the year 1875, and partially in 1876, till the meeting in December of that year—the rule limiting the claims to 50 feet by common consent falling into disuse and ceasing to be in force.

As held by the supreme court of California, in commenting upon the provision of the state statute cited, which is still in force:

"No distinction is made by the state statute between a custom or usage, the proof of which must rest in parol, and a regulation which may be adopted by a miners' meeting, and embodied in a written local law. This law does not, like a statute, acquire validity by the mere enactment, but from the customary obedience and acquiescence of the miners following the enactment. It is void whenever it falls into disuse, or is generally disregarded. It must not only be established, but *in force*."

"A custom reasonable in itself and generally observed will prevail as against a written mining law which has fallen into disuse. It is a question of fact for the jury whether the mining law is in force at any given time."

It is for you, then, gentlemen of the jury, to determine whether this limitation to 50 feet was actually in force at the time the location of the Lucky Jack, 300 feet wide on each side, was made. The fact that the rule in question was adopted and kept on foot in the laws for a considerable period of time would be *prima facie* evidence, nothing to the contrary appearing, that it was in force at one time; and, being once in force, a presumption would arise that it continued in force till something appears tending to show that it had been repealed, or had fallen into disuse, and another practice been generally adopted and acquiesced in. The mere violation of a rule by a few persons only would not abrogate it if still generally observed. The disregard and disuse must become so extensive as to show that in practice it has become generally disused. Now, gentlemen, whether, in view of there being few locations in this district during several years, and none in some, and of the passage of the act of congress referred to, and the location at first, after the revival of the mining interest in 1875, of most all claims, in pursuance of the provisions of the act, 300 feet wide on each side, if such be the fact, and in view of all the circumstances appearing in the evidence, it is for you to determine whether the 50 feet limitation had fallen into disuse, or was really *in force* at the time of the location in question. If it was *not* in force, then in that particular, if otherwise valid, the location was good and valid to the full extent of 300 feet on each side of the vein. If the limitation was in force, then it was void as to the excess over 50 feet on each side of the vein, but valid to the extent of 50 feet and no more.

The statute also provides, gentlemen of the jury, that "no location of a mining claim shall be made until the discovery of a vein or lode within the limits of the claim located." So that no rights can be acquired under the statute by a location made before the discovery of a vein or lode within the limits of the claim located. A vein or lode authorized to be located is a seam or fissure in the earth's crust filled with quartz, or with some other kind of rock, in place, carrying gold, silver, or other valuable mineral deposits named in the statute. It is not enough to discover detached pieces of quartz, or mere bunches of quartz not in place.

The vein, however, may be very thin, and it may be many feet thick or thin in places—almost or quite pinched out, in miners' phrase —and in other places widening out into extensive bodies of ore. So, also, in places it may be quite or nearly barren, and at other places immensely rich. It is only necessary to discover a genuine mineral

vein or lode, whether small or large, rich or poor, at the point of discovery within the lines of the claim located, to entitle the miner to make a valid location, including the vein or lode. It may, and often does, require much time and labor and great expense to develop a vein or lode, after discovery and location, sufficiently to determine whether there is a really valuable mine or not, and a location would be necessary before incurring such expense in developing the vein to secure to the miner the fruits of his labor and expense in case a rich mine should be developed. If, then, the locators of the Lucky Jack discovered such a mineral vein or lode as I have described, however small, before the location of that claim, the location of the claim embracing within its lines the vain or lode so discovered was in this particular valid; otherwise, not. The same observation would be true as to each of the other claims held by the plaintiff or defendant.

The defendant claims that its grantor discovered such a vein or lode as I have described in Lucky Jack, shaft No. 1. You have heard the testimony on the point, and it is for you to determine whether they did or not. If they did, then the location is good in that respect; otherwise, it is not.

It is not necessary that the locator should be the first discoverer of the vein, but it must be known to him, and claimed by him, in order to give validity to the location. I instruct you further that if a party should make a location in all other respects regular, and in accordance with the laws, and the rules, regulations, and customs in force at the place at the time upon a supposed vein, before discovering the true vein or lode, and should do sufficient work to hold the claim, and after such location should discover the vein or lode within the limits of the claim located, before any other party had acquired any rights therein, from the date of his discovery his claim would be good to the limits of his claim, and the location valid.

The defendant also claims that its grantors discovered veins in shaft No. 2, and its drifts and cross-cuts, long before plaintiff acquired any rights in the ground. If so, the claim is good in that particular. Similar discoveries are claimed to have been made by its grantors in the Warren Loose shaft, drift, winze, etc.

So, also, gentlemen of the jury, where a party has made a location upon a mineral vein or lode discovered by him, in all respects valid, he is entitled to "have the exclusive right of possession and enjoyment of all the surface included within the lines of his location, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended down-

wards vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downwards as to extend outside the vertical lines of such surface location."

That is to say, if the defendant or its grantors discovered a mineral vein or lode in the Lucky Jack claim, and made and has now in all respects a valid location of that claim, then it is not only entitled to the particular vein or lode so discovered and located in said claim, but to all other minerals, veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of its surface lines extended vertically downwards, to which no right had attached in favor of other parties at the time its location became valid, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downwards as to extend outside the vertical side lines of the surface location.    If the defendant has a valid claim to 600 feet wide, then its right extends to all such veins or lodes, under the conditions stated, so within the surface lines bounding the 600 feet drawn vertically downwards; and if the Actæon vein in question is one of the veins having its top or apex within such surface lines drawn vertically downwards, its right extends to and includes that vein.    If it has a valid claim to 100 feet wide, and only so much, then to such veins or lodes within the 100 feet lines.

The same principle and instruction applies to the defendant's other claims.    If the defendant has a valid location to those claims, or either of them, then it is entitled to all the veins or lodes under similar circumstances, the apices or tops of which lie within the surface lines of such valid location or locations extended vertically downwards.

The next point to which I shall call your attention, gentlemen of the jury, is the location.    To make a valid location under the statute, it is required that the "*location* must be distinctly marked on the ground so that *its boundaries can be readily traced*," but the law does not define or prescribe what kind of marks shall be made, or upon what part of the ground or claim they shall be placed.

Any marking on the ground claimed, by stakes and mounds, and written notices, whereby the boundaries of the claim located can be readily traced, is sufficient.    But there must be some such marking, and when a mining claim is once sufficiently marked out upon the ground, and all other necessary acts of location are performed, it vests the right of possession in the locator, which right cannot be divested by the obliteration of the marks or removal of the stakes without the fault of the locator so long as he continues to perform

the necessary work upon the ground and to comply with the law in other respects.

If, then, the jury believe from the evidence that the Lucky Jack claim did not exceed in quantity the amount allowed by the United States laws, and was located in conformity with the actual practice and custom of miners in force in the year 1875, as to the size of claims in the Bodie mining district, and that before the location of the claims of the plaintiff thereon it was actually and distinctly marked on the ground by stakes, notices, monuments, and work, so that its boundaries could be readily traced, and a vein containing gold or silver had been discovered therein, and sufficient work was done thereon to comply with the laws of congress and the local regulations, and if no record was required other than that actually made, then the lucky Jack location was valid, and entitled the locator to the exclusive possession thereof; otherwise, not.

There is testimony tending to show that the rule and custom of miners in Bodie district at the time the Lucky Jack location, under which defendant claims, was made, required mining claims to be recorded within a certain time after location, and testimony also tending to show that there was no mining recorder elected in Bodie district from July 3, 1869, to October 9, 1875,—more than six years, including the period of this location; and that during a portion of this time, at least, in the apparent uncertain condition of affairs, some locators recorded their claims in the office of the county recorder, and also in the books of the district in the possession of the last preceding recorder, or of the last preceding deputy recorder, of the district, and the Lucky Jack, at least, in the county recorder's office only.

If you find a rule or custom to record to have been in force in the district at the time, then a record was necessary to perfect and preserve the rights of the locators as against all subsequent locators, at least, not having actual notice of the prior location. If no such custom was in force, then no record was necessary. It was only necessary, in any event, to record at the place where the custom known and in force at the time of the location required the record to be made. If it was sufficient, under the custom in force, to record the location in the county recorder's office, then a record there was sufficient; otherwise, not. And the fact that many miners did so record, is evidence tending to show that they thought such record available, and relied on it, and tending to show such custom. The custom to record, *and the place of the record*, to be binding, ought to be so well known, understood, and recognized in the district that locators should

have no reasonable ground for doubt as to what is required to make and preserve a valid location. It is for you, gentlemen, to determine, from the evidence in the case, what record, if any, and the place where it must be made, the custom in force at the time required; whether the custom was in all particulars sufficiently known and recognized to make it binding upon the miners; and whether the location of the Lucky Jack claim substantially conformed to it. In determining these questions, the fact, if it be a fact, that there was an uncertainty as to where a record should be made,—some recording in the district records, some in the county record's office, and many in both; the fact that there was no recorder elected for six years; that Bechtel, the last deputy, and the man who seems to have actually done the recording, resided, during a portion of the time, out of the district, coming, in some instances, at the request of parties from his residence into the district to record claims; and the fact that miners, at their first meeting in October, 1875, after several years' *hiatus* in their meetings, deemed it necessary, or at least prudent, to ratify and validate by resolution the records of the preceding five or six years,—are all circumstances that the jury are entitled to consider, as tending to show that there was no custom as to the place where the record should be made, prevailing during that period, sufficiently certain, well known, and defined, and generally recognized and acquiesced in, to be of any binding force.

The jury are entitled to give those circumstances such weight, in connection with all the other evidence bearing upon the question, as they deem them entitled to receive. And it is for you to determine whether, under the circumstances, a record in the county recorder's office was sufficient.

If a record was required, then, in order to make a valid record, it was necessary for it to contain the name or names of the locator or locators, the date of the location, and such a description of the claim or claims located, by reference to some natural or permanent monument, as would identify the claim.

The natural objects or permanent monuments here referred to are not required to be on the ground located, although they may be; and the natural object may consist of any fixed natural object; and such permanent monument may consist of a prominent post or stake firmly planted in the ground, or of a shaft sunk in the ground.

The exact effect of a record, or want of a record, I have not before had occasion to consider. The law of congress authorized miners to make regulations "governing the location and manner of recording

\* \* \* mining claims." This language implies that the act of location is distinct and different from the act of recording, except in districts where the regulations of the miners make the recording an act of location, or one of the acts necessary to constitute a location. But in the Bodie mining district there is no evidence of a miners' regulation or rule which makes recording an act of location, or necessary to a valid location. The location is always referred to in the rules in evidence as distinct from and preceding the record, so that a location of a mining claim in that district, at any time in the year 1875, may have been complete or perfect before any record thereof was made.

Independent of the question of forfeiture, therefore, it follows, under the written rules in evidence, that by an otherwise valid location of a mining claim in the Bodie mining district, at any time in 1875, a person may have acquired the exclusive right of possession and enjoyment of such claim, at least as against other parties having actual notice of the claim, its position and extent, before recording such location.

Assuming the proposition that the miners have authority to make a regulation or law by which a mining claim may be forfeited by failure to record the location thereof, yet such regulation or law, in order to effect a forfeiture, must provide that such failure to record shall work a forfeiture of the claim. In the language of the supreme court of California:

" The failure of a party to comply with a mining rule or regulation cannot work a forfeiture unless the rule itself so provides. There may be rules and regulations which do not provide that a failure to comply with their provisions shall work a forfeiture; if so, a failure will not work a forfeiture." *Bell* v. *Bed Rock Co.* 36 Cal. 219. " The failure to comply with any one of the mining rules and regulations of a district is not a forfeiture of title. It would be enough to hold the forfeiture as the result of non-compliance with such of them as make non-compliance a cause of forfeiture." *McGarrity* v. *Byington*, 12 Cal. 431.

As a general principle of law, forfeitures are not favored.

The object of recording mining claims is to give notice to others desiring to locate claims in the vicinity. The congressional law does not require a record, but prescribes what a record shall contain when it is required by the local rules.

If there were no local rules in Bodie mining district attaching the penalty of forfeiture to the failure to record in that district, and recording was not made by custom an act of location, then the fact

that the Lucky Jack claim was not recorded in the records of Bodie mining district will not invalidate the location, as to any party having actual notice of that location, and in that case the jury are instructed that if the Lucky Jack location was regular in all other respects, and the laws requiring work were complied with, the fact that the claim was not recorded in the Bodie mining district did not invalidate the location, or make it lawful for plaintiff's grantors, if they had actual notice of the previous location, to enter and locate the ground covered by the Lucky Jack location.

The testimony also tends to show that prior to the location of the Daley claim, or to any rights being acquired thereunder by the plaintiff, the defendant or its grantors, in addition to the stake or stakes, whichever it was, and notice put up at the time of location of the Lucky Jack claim, surveyed out that claim and planted prominent surveyors' stakes and monuments at the various corners of the claim, distinctly marking it out and forming a parallelogram 1,500 feet long by 300 feet wide, and entered into actual possession, and it is claimed that if there was at the time of the location any defect in the marking on the ground, this additional marking, before any rights were acquired by the plaintiff in the Daley, was clearly sufficient to validate the claim as to that location. In regard to this point I instruct you, gentlemen, that a subsequent locator cannot object that a prior location of a mining claim was not sufficiently marked on the ground at the time of its location, provided such prior location was sufficiently marked on the ground before such subsequent locator made any location or acquired any rights in such claim.

If, therefore, the claimants of the Lucky Jack surveyed and properly staked or marked out their claim, and performed all the other acts necessary to make a valid location, before any rights were acquired in the Daley ground by the location of that claim, then the better title vested in the owners of the Lucky Jack to all the Daley claim embraced in the Lucky Jack which the locators of the latter were entitled to locate and hold.

The statute requires $100 in value of work to be done on each claim located after May 10, 1872, in each year, in order to hold it; and, in default of such work being done, authorizes the claim to be relocated by other parties, provided the first locator has not resumed work upon it. But if the first locator resumes work at any time after the expiration of the year, before other rights attach in favor of relocators, he preserves his claim.

The statute nowhere authorizes a person to trespass upon or to relocate a claim before properly located by another, however derelict in performing the required work the first locator may have been, provided he has returned and resumed work, and is actually engaged in developing his claim at the time the second locator enters and attempts to secure the claim.

Whether the work was done as required by the statute is a question for you to determine from the evidence. Work done by any of the grantors of defendant while holding the claim, whether holding the legal or equitable title, during the performance of the labor or work done in the interest of the claim, is available to preserve the claim, and no mere relocation for forfeiture, made before the forfeiture actually attaches by actual default, would be valid to defeat the claim. Any work done by the Bodie Company on the claim for that purpose, after the conveyance to it, October 7, 1877, and before May 26, 1878, is available as work for the year from May 26, 1877, to May 26, 1878, to prevent a forfeiture. With regard to the work required to be done in order to hold a claim, the jury are further instructed that where one person or company owns several contiguous or adjoining claims capable of being advantageously worked together, one general system may be adopted to work such claims. Such system may consist of a shaft with drifts, cross-cuts, and tunnels therefrom, and such works need not be upon any of the claims in question. When such system is adopted, work in furtherance of the system is work on the claims intended to be developed by it. Work done outside of the claims, or outside of any claim, if done for the purpose and as a means of prospecting or working the claim, is as available for holding the claim as if done within the boundaries of the claim itself.

To conclude, gentlemen of the jury, in view of the legal principles I have stated to you, if you find from the evidence that the so-called Actæon vein, upon which the trespass is alleged to have been committed, is not one of the veins actually located in either the Savage, East Savage, Riordan, or Daley claims, and if its top or apex is not within the planes of the side lines of either of said claims drawn vertically downwards, then it does not belong to the plaintiff, and your verdict must be for the defendant, whether it has title to the claim or not. The plaintiff cannot recover unless the vein belongs to it. So, if the top or apex of said Actæon vein is within the planes of the side lines drawn vertically downwards of any mining claim to which

the defendant has shown a valid title prior in point of time to the title to any of the four claims relied on by plaintiff in like manner embracing said vein, whether such valid prior claim of defendant be 600 or 100 feet wide, the verdict must also be for the defendant. But if, on the contrary, you find that the said Actæon vein, at the point where the trespass is alleged to have been committed, is the vein actually discovered and located by plaintiff's grantors, in any one of the said four claims of the plaintiff, or that it has its top or apex within the planes of the side lines of any one of said four claims drawn vertically downwards, and if you further find that the defendant has not shown a title as against said plaintiff by a valid subsisting prior location embracing said top or apex within its side lines drawn vertically downwards, then your verdict must be for the plaintiff.

Gentlemen, I believe the testimony is very indistinct as to the amount of damages. No testimony was offered as to the amount of damages. If you find for the plaintiff, and you have no testimony on which to estimate correctly the amount of damages sustained, you will find nominal damages, say one dollar. The form of the verdict will be, "We, the jury, find for the plaintiff, and assess the damages at so much." If you find for the defendant your verdict will be, "We, the jury, find for the defendant."

*A Juror.* How can the jury find a certain sum when no evidence was offered?

*The Court.* You will then find nominal damages, one dollar.

The verdict of the jury was for the defendant.