WAILES v. DAVIES et al.

(Circuit Court, D. Nevada. December 23, 1907.)

No. 814.

1. MINES AND MINERALS—LOCATION OF MINING CLAIMS—NECESSITY OF RECORDING CERTIFICATE.

Comp. Laws Nev. 1900, § 210, providing for the recording of certificates of location of mining claims, is directory only, and, where the doing of the acts required to make a valid location is fully proved by other testimony, it will not be invalidated by a failure to record a certificate thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mines and Minerals, §§ 45–50.]

2. SAME—FORFEITURE OF CLAIMS—BURDEN OF PROOF TO ESTABLISH.

The burden of proof is always upon the party seeking to establish the forfeiture of a mining claim, and the proof must be clear and convincing that the owner has failed to comply with the law.

3. SAME—ASSESSMENT WORK—CHARACTER OF WORK REQUIRED.

Rev. St. § 2324 [U. S. Comp. St. 1901, p. 1426], which requires that not less than $100 worth of labor shall be performed or improvements made on a mining claim during each year, does not specify the kind of labor, and labor expended in extracting ore from the claim is within the requirement. It is only when labor is performed without the boundaries of the claim that its character becomes material, and in that case it must tend to the development or improvement of the claim or it will not count.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mines and Minerals, §§ 51–55.]

4. SAME—CLAIM OWNED BY CORPORATION—WORK DONE BY STOCKHOLDER.

A stockholder in a mining company has such a beneficial interest in the corporate property that any mining work done by him on unpatented claims of the company must be counted as representation work, and if sufficient in amount, and done at the proper time, will prevent a forfeiture of the claims.

5. FRAUDULENT CONVEYANCES—SUFFERING LOSS OF PROPERTY—MINES—RELOCATION TO DEFRAUD CREDITORS—EFFECT IN EQUITY.

On December 29th, defendant obtained a judgment against a mining company, and on the next day an execution was issued and levied on unpatented mining claims of the company, under which the claims were sold and purchased by defendant. On January 1st, following the levy, complainant, at the instance of one of the stockholders of the company and with the connivance and assistance of others, relocated such claims, claiming that they had been forfeited by the failure of the company to do the required assessment work for the preceding year. In fact a sufficient amount of work had been done on some of the claims by the stockholder procuring the relocation, and his purpose was to defeat the collection of defendant's judgment, of which purpose complainant had actual or con-

structive knowledge. *Held* that, under Comp. Laws Nev. § 2708, which provides that all conveyances with intent to hinder, delay, or defraud creditors are void as against such creditors, as well as under the common law, the attempted relocation was fraudulent, and that a court of equity would not grant complainant relief by quieting his title as against defendant.

In Equity.

Henry K. Mitchell, for complainant.

Alfred Chartz, for defendants.

FARRINGTON, District Judge.    This is a suit to quiet title to certain mining claims in Eureka county, Nev.    Prior to January 1, 1905, the entire property, consisting of 11 claims, known as the Amazon, Prince of Wales, Copper Glance, Jefferson, Copper Nut, Copper King, Copper Bolt, Daisy, St. Denis, Blue Jay, and Black Bird, belonged to the Whalen Consolidated Copper Mining Company, an Illinois corporation.    December 29, 1904, the defendant Davies obtained a judgment in the District Court of the Third Judicial District of the state of Nevada, in and for the county of Eureka, against said company, for the sum of $1,792.77.    December 30, 1904, execution was issued, and on the following day it was levied on the mining claims just mentioned. February 18, 1905, all of these mining claims were purchased on execution sale by defendant Davies.    It is alleged that complainant Wailes relocated each of said mining claims January 1, 1905; also, that each claim so relocated had been abandoned by the Whalen Consolidated Copper Mining Company.

1. No issue has been raised as to the regularity of the execution sale, and although there has been some contention as to the time when the relocations were made, and the discovery work done, still the weight of testimony is to the effect that stakes were erected, monuments placed, corners marked, and the discovery work done on each claim alleged to have been relocated by Wailes, in strict accordance with law.    Whether the statute relating to the certificates of location (Comp. Laws Nev. § 210) was observed with equal strictness is open to question; but any discussion of that subject, under the recent decision of this court in the case of Zerres v. Vanina (C. C.) 134 Fed. 610, and under the still more recent decision of the Supreme Court of the state of Nevada in the case of Ford v. Campbell, 92 Pac. 206, would be unprofitable.    The doing of the acts required by law has been established by testimony of men actually employed in the work, and the additional proof which might have been afforded by properly drawn and recorded certificates of location is unnecessary.    The locations also appear to have been based upon a discovery of valuable mineral within the limits of each claim.

2. The next questions bring us to the real issue in the case.    Was the mining ground so relocated open to relocation?    Had the Whalen Consolidated Copper Mining Company forfeited or abandoned its claims by failing to do the annual labor required by law for the year 1904? If the answer is in the negative, the mines were the property of the company, and defendant must prevail by virtue of the execution sale. On the other hand, if the annual labor was not performed, complainant

must prevail by virtue of his relocations, unless it should appear that he obtained the property in such a manner that a court of equity can afford him no relief. The burden of proof is always upon the party seeking to establish the forfeiture of a mining claim. Courts have always been very reluctant to enforce forfeitures; "they have settled the doctrine that a forfeiture cannot be established except upon clear and convincing proof of the failure of the former owner to have work performed or improvements made to the amount required by law." 2 Lindley on Mines, §§ 643, 645; Hammer v. Garfield M. & M. Co., 130 U. S. 291, 301, 9 Sup. Ct. 548, 32 L. Ed. 964.

3. The evidence shows that no work was performed on the Copper Glance, Copper Nut, Daisy, St. Denis, Blue Jay, or Black Bird claims for the year 1904; and it also shows that the requisite amount of labor was not performed on the Jefferson or the Copper Bolt for that year. Nor is there any evidence in the record showing that work performed on other mines tended to develop or benefit the eight claims last mentioned. Consequently, as between the parties to this suit, I shall hold that the representation work for the year 1904 was not performed on the Copper Glance, Copper Nut, Daisy, St. Denis, Blue Jay, Black Bird, Jefferson, or Copper Bolt.

4. The testimony in relation to the amount of work done on the Copper Nut, Amazon, and Prince of Wales for the year 1904 is not entirely harmonious. All the witnesses on this subject say that work was done on the Prince of Wales and Copper Nut, but do not agree as to the amount. Mr. Leighton, a witness for complainant, testifies that two men worked on the Copper Nut not more than two or three days, at $3 per day; on the Prince of Wales, two boys worked four or five days getting out waste, at a cost of $2 per day each; and three men and two boys, with a horse, were engaged five or six days getting out ore from the Prince of Wales—for three or four days there were four men instead of three—the men were paid $3 per day. Mr. Shaw testifies that there was fully $100 worth of work done on each of said mines, namely, the Prince of Wales, Amazon, and Copper Nut. Nine men worked on the Copper Nut for four or five days. On the Prince of Wales seven men worked continuously for three weeks, then two men were taken away, and Mr. Shaw continued to work there two weeks longer, with two horses, hoisting waste. The Prince of Wales and Amazon were worked through the same shaft. James Mackey, a miner, and apparently a disinterested witness, testifies that he worked on the claims of the Whalen Consolidated Copper Mining Company 31 days, beginning May 23, 1904. At the time he commenced there were eight or nine men at work, and when he quit there were four or five persons still at work. He began work on the Copper Nut, then went to the Prince of Wales and worked about three weeks. The Amazon and Prince of Wales are practically the same mine, he worked on both. He also worked five or six days on the new shaft on the Prince of Wales. Frank C. Lewis, a witness for defendant, also a miner, and apparently distinterested, testified that he commenced work on the mines about May 1, 1904, and worked until August 2, 1904. There were nine or ten men working part of the time, and four all of the time. Two hundred dollars' worth of work was done on the Prince of Wales, $100

worth on the Amazon, and $120 worth on the Copper Nut for the year 1904. Charles Lay for the complainant, testifies, as follows:

"We took out the ore from the Prince of Wales, and some from the Copper Nut, on the dumps, and in the meantime Mr. Leighton and I had taken up some other claims, and we took ore from them, and I shipped that ore, twenty-three tons of it, to California, and twelve tons of it to Salt Lake City. * * * There was no work done except the ore that I shipped away from there. That was on three, and maybe, perhaps, four, claims; not more than that."

Only 14 sacks of this ore was taken from mines not owned by the company. As the ore was sorted, and only the most valuable shipped, it is safe to assume that much more than 35 tons was extracted. Complainant's contention that $100 worth of labor was not performed on each of the three claims is not supported by that clear and convincing evidence which is essential to establish such a fact in cases of this character. I must therefore hold that the labor performed in 1904 on the Prince of Wales, the Copper Nut, and the Amazon amounted to more than $100 worth for each claim.

5. The objection that extracting ore is not development work is entirely immaterial. The language of the statute is "on each claim located after the 10th day of May, 1872, and until a patent has been issued therefor, not less than one hundred dollars' worth of labor shall be performed or improvements made during each year." Rev. St. § 2324 [U. S. Comp. St. 1901, p. 1426]. Obviously the purpose of this statute is to require the mine owner to evidence his good faith by performing $100 worth of labor on each claim each year until patent issues. The statute does not require any particular character of labor; it does not require that the work shall be wisely and judiciously done; nor does it say how the work shall be performed. The fact is, the better the mine, the greater the portion of labor which is devoted exclusively to the extraction of ore; and the ideal mine is one in which no prospecting or development work is necessary, where no work is required except the extraction of ore, and the depletion of the treasure, which is the sole value of the mine. If $100 worth of labor in the nature of mining is performed on a claim by the owner, whether the work is beneficial or not, there can be no forfeiture. The character of labor becomes material when it is performed without the boundaries of the claim. In that event, the labor must tend to the development or improvement of the mining claim for which it is designed, otherwise it will not count.

6. Complainant earnestly contends that this work was not done by or under the authority of the company; that Mr. Lay, in 1904, was neither an agent nor an officer of the company; that he had no intention of doing the assessment work, and consequently the work on the three claims cannot inure to the benefit of the company or defendant Davies. Mr. Lay testifies that he was neither an officer nor an agent of the Whalen Consolidated Copper Mining Company during 1904 and the three preceding years; that he had no authority from the company, and was on the ground simply as a stockholder representing himself. He resigned his office as secretary in 1900, but "still continued to be the chief man in interest, or in attempting to get others to

put their money in there to keep this thing alive," and was "the principal man interested in the Whalen Consolidated Copper Mining Company in looking after the work during all of the years." He was the owner of more than 22,000 out of a total of 100,000 shares of the capital stock of the company. His expenses incurred in performing the work on the mines for the years 1901, 1902, and 1903 amounted to about $2,700, and, in addition to this, there was the expense of his trip to Carson in 1904 to attend the trial of a case in which that company was interested.

Charles Lay also testifies:

"We tried to keep the old company alive by doing the work in each year. In 1901 I asked a number of people to join me that were owners of the stock, and only one would do so."

Mr. Lay claims that in 1901 he advanced half the money, and the Billings estate the other half, and with this the assessment work for that year was done. In 1902, according to his testimony, all the other stockholders refused to contribute, and he and the Billings estate again paid for the work. In 1903 Mr. Lay paid for the work with money which he borrowed for that purpose. During these years the annual labor was performed under the direction of Mr. Lay, and at such times it appears that he was neither a director nor an officer of the company. The testimony shows no direct action by the company or its officers, authorizing, directing, or providing for the assessment work in 1904, and the same may be said as to the years 1901, 1902, and 1903. Mr. Lay may have been on the ground in 1904 simply as a stockholder representing his own interest. There is substantially nothing to indicate that he was on the ground in any different capacity in the three preceding years, or that, during the three previous years, he was clothed with any larger or different authority from the company than he had in the year 1904.

Special stress is laid upon the testimony of Mr. Lay that, at the time the work was being done, he had no intention that it should apply as annual labor, and that his object in doing the work in 1904 on the three mines mentioned was to reimburse himself for the moneys he had spent on the mines of the company during the previous years. This testimony was given in March, 1906—almost two years after the event. There is much in the contemporaneous transactions which fails to corroborate this testimony. The words and conduct of Mr. Lay in 1904 are much more persuasive testimony as to his purposes and intentions. The stockholders of the company met in January, 1904, and they also held a second meeting in March, 1904. The directors had a meeting in April, 1904. February 26, 1904, 18,040⅔ shares of the capital stock of this company were issued to Mr. A. E. Baldwin, 2,130 shares to Thomas C. McMillan, 600 shares to Charles H. Brenan, 23,181⅓ shares to Charles Lay, 2,000 shares to Mary Shaffer, and 251 shares to Thomas A. Olney. Some time in April of that year Charles Lay went to the mines, and remained there until the following July. These facts indicate no intention to abandon the company or its property. On his arrival at the mines in May, Mr. Lay had a few hundred dollars; with this money he employed a small force of men, and

took out ore from the Prince of Wales, the Amazon, and the Copper
Nut. This work was done under practically the same authority, and
with the same tools, as in previous years.

Mr. Lay, on his direct examination, testifies as follows:

"Q. What, if any, efforts did you make in 1904 to induce the company, or the
stockholders of the company, to do the assessment work for the year 1904?
A. I went to all the large stockholders and asked them to pay me back some
of the money I had paid, and if they did I would continue to do the work.
* * * Q. What time of the year in 1904 was it that you had these talks
with the stockholders which you have testified to? A. Here [Chicago], in
October and November. I first had talk with two of them before I went out
there in May, and I was trying to get them to put up money."

It is thus evident from his own statement that Mr. Lay was trying
to raise money for the assessment work before he set out for the mines
in May, 1904. After doing the work to the amount of at least $300,
on 3 of the 11 claims belonging to the company, he returned to Chicago,
and in October and November of that year he asked all of the large
stockholders, except the two spoken to in May, to pay him back a por-
tion of the money he had expended, and promised if they would do so
to continue the work. It is inconceivable that Mr. Lay was asking all
the large stockholders to reimburse him for trespassing on the com-
pany's property. A promise by a trespasser to continue trespassing
could not be a very strong inducement to the stockholders to pay for
previous trespasses. The only reasonable interpretation to be placed
on this statement of Lay is that he had done the assessment work on
three of the claims, and, if a part of his disbursements were repaid, he
would continue the work on the other eight claims. The fact that he
interviewed all the large stockholders does not indicate that he was
acting in hostility to the company, nor is there any testimony which in-
dicates that the stockholders at that time regarded the act as a trespass.
Furthermore, the fact that he was not taking out and shipping the ore
for his own exclusive benefit adversely to the interests of the company,
but with a view of paying the debts due from the company to himself,
not only precludes the idea that he was a trespasser, but indicates that
he was acting for the benefit of the company.

The federal act in relation to the performance of annual labor says
nothing as to the person by whom it shall be performed. The obvious
purpose of the law is to exact work as an evidence of good faith on
the part of the owner, and also to discourage the holding of mining
claims without development or intention to develop, to the exclusion
of others who could and would improve such ground if they had op-
portunity. Manifestly, the annual work must be performed by the
owner, at his instance, by some one in privity with him, or by some
one who holds an equitable or beneficial interest in the property. Work
by such a person will inure to the benefit of the claim. 2 Lindley on
Mines, § 666; Jupiter Mg. Co. v. Bodie Con. Mg. Co. (C. C.) 11 Fed.
666; Book v. Justice Min. Co. (C. C.) 58 Fed. 106; Godfrey v. Faust,
18 S. D. 567, 571, 101 N. W. 718; Eberle v. Carmichael, 8 N. M. 169,
42 Pac. 95; Anderson v. Caughey, 3 Cal. App. 22, 84 Pac. 223, 225;
Dye v. Crary (N. M.) 85 Pac. 1038, 9 L. R. A. (N. S.) 1136.

In Jupiter Mg. Co. v. Bodie Con. Mg. Co. (C. C.) 11 Fed. 666, Judge Sawyer charged the jury:

"That work done by any of the grantors of defendant while holding the legal or equitable title during the performance of the labor, or work done in the interest of the claim, is available to preserve the claim."

In Godfrey v. Faust, 18 S. D. 567, 571, 101 N. W. 718, the mine in dispute belonged to the defendant Faust. The superintendent of the Boston & South Dakota Company had a contract in his own name with Faust for the purchase of the property. The contract had not been assigned to the company, but the company furnished the money for the representation work. It was held that this was sufficient evidence that the superintendent was holding the contract in trust for the company, and that the company had the right to do the assessment work.

In Book v. Justice Min. Co. (C. C.) 58 Fed. 106, the mines in question were located by an employé in his own name, but for the benefit and at the expense of the company. The company being thus the equitable owner of the property, it was held that work performed by the company should be counted as representation work.

In Dye v. Crary (N. M.) 85 Pac. 1038, 9 L. R. A. (N. S.) 1136, it was held that one who bought an interest in an unpatented mining claim at a void judicial sale could pay that portion of the cost of the representation work which was due from the judgment debtor, and that such a payment on forfeiture proceedings by a co-owner would prevent a forfeiture as against the judgment debtor.

It is undoubtedly the law, as complainant contends, that a corporation is an entity distinct from its stockholders, and holds its property absolutely as a natural person may. The stockholder by virtue of his ownership of the stock has no legal title to any of the property of the corporation. The deduction which complainant makes from this is that assessment work on corporate property cannot be performed except by corporate action; that there can be no corporate action except by the trustees or directors acting formally as such, or by action of the officers of the company; that Lay, Shaw, and Leighton, when they performed work on the Prince of Wales, Amazon, and Copper Nut in 1904, though stockholders, were strangers to the title, and therefore trespassers, and consequently their work cannot inure to the benefit of the corporation. I cannot concur in these conclusions. There can be corporate action which is not formal corporate action. Corporate action may occur in other ways than by the formal proceedings of officers and boards of directors. It may arise from a long course of dealing which estops the corporation from denying that mode of conduct, or it may arise by acquiescence or acceptance by the corporation of the benefits of a transaction. While a corporation owns the legal title to all its property, and there is absolutely no legal title therein vesting in any of its stockholders, still each stockholder has an interest in the property of the corporation. Bridgman v. City of Keokuk, 72 Iowa, 42, 33 N. W. 355. If the directors and officers of a mining company, holding and owning unpatented mining claims, fail and neglect to do the annual labor necessary for the protection of such property, and, in consequence, the claims are lost, the loss is practically and ul-

timately the loss of the stockholders of the company. It has frequently been held that a stockholder, merely as a stockholder in a corporation, has such an interest in the corporate property that he may take out a policy of insurance for the protection of that interest. This rule is based on the theory that the beneficial interest in the property of the corporation is in the stockholders. Seaman v. Enterprise Fire & Marine Ins. Co. (C. C.) 18 Fed. 250; Mannheim Ins. Co. v. Hollander (D. C.) 112 Fed. 549, 552; Warren v. Davenport Fire Ins. Co., 31 Iowa, 464, 468, 7 Am. Rep. 160; Riggs v. Commercial Mut. Ins. Co., 5 N. Y. Supp. 183; Id., 125 N. Y. 7, 25 N. E. 1058, 10 L. R. A. 684, 21 Am. St. Rep. 716. Where the property of a corporation has been sold under execution, and no steps taken by the corporate authorities to redeem the property within the period limited by law, a stockholder has been permitted, in California, to redeem the property for the benefit of the corporation, and hold the corporation liable for moneys advanced for that purpose. Wright v. Oroville Mg. Co., 40 Cal. 20.

In Miner v. Belle Isle Ice Co., 93 Mich. 97, 53 N. W. 218, 17 L. R. A. 412, 418, the court says:

"Although stockholders are not partners, nor strictly tenants in common, they are the beneficial joint owners of the corporate property, having an interest and power of legal control in exact proportion to their respective amounts of stock. The corporation itself holds its property as a trust fund for the stockholders, who have a joint interest in all its property and effects, and the relation between it and its several members is, for all practical purposes, that of trustee and cestui que trust. Peabody v. Flint, 6 Allen (Mass.) 52–56; Hardy v. Metropolitan Land & F. Co., L. R. 7 Ch. App. 427; Stevens v. Rutland & B. R. Co., 29 Vt. 550."

A stockholder is not altogether a stranger to the title to the corporate property. He has an equitable or beneficial interest therein. It is unnecessary to define that interest. It is sufficient to say the ownership of such an interest predicates a right in the owner to protect that interest; from this it follows that he has also the right to insist that the corporate property shall be protected from fraudulent, tortious, and wrongful injury, conversion, misappropriation, or destruction. Dodge v. Woolsey, 18 How. 331, 341, 15 L. Ed. 401; Wright v. Oroville Mg. Co., 40 Cal. 20, 27; 4 Thompson on Corp. § 4520; Helliwell on Corp. § 411. If the directors and officers of a mining company negligently or fraudulently failed to do the requisite representation work on the company's unpatented claims, and thereafter relocated the property for themselves, a court of equity at the instance of a stockholder would undoubtedly compel restitution of the property. It is difficult to see why work performed upon such claims by a stockholder who had peaceably entered thereon prior to forfeiture should not be counted as representation work, if performed at the proper time. These considerations lead me to conclude that a stockholder in a mining company has such a beneficial interest in the corporate property that any mining work done by him on the unpatented claims of the company must be counted as representation work. The work done by Mr. Lay on the Prince of Wales, Copper Nut, and Amazon in 1904 was sufficient to protect those claims from forfeiture and relocation.

December 29, 1904, the defendant Davies obtained his judgment for $1,792.77 against the company. The evidence does not show just when

the action was commenced which terminated in the judgment for Davies, but it is safe to assume that it was some time in the fall of 1904, perhaps about the time when Mr. Lay wrote to complainant Wailes that the company was "up against it" financially; that they were afraid of losing the property; that Benson would try to get hold of the property, and if Wailes would put up some money and get in touch with Benson there might be something in it for him. It is clear that Mr. Lay's purpose—and he seems to have been the moving spirit in the whole transaction—was to defeat this judgment. Lay testifies that he furnished Wailes with the information about the mines, and urged him to relocate them. January 30, 1905, in the same month that the relocations were made, Lay wrote to Shaw, one of the men who assisted in doing the discovery work for Wailes, and also in doing the work on the three claims in June and July, 1904:

"I want you to go into Eureka, if you are willing, and be a witness for Wailes that the Whalen Company had not done the assessment work in 1904, I wish Mr. Trimbath could be induced to be also a witness; talk with him quietly; write me. Of course we can get Olney, but I would like also to have Trimbath. Don't let on to any one that I have written to have you ask him— Trimbath. * * * If you will be one of his, Mr. Wailes', witnesses as to the assessment work not having been done, I want you to go in Friday 17th so as to swear and file your affidavit with Spinner. * * * Let me know if you are willing to be one of Mr. Wailes' witnesses so I can have the papers prepared."

Later Mr. Shaw made an affidavit, as requested, in which he says:

"That he is well acquainted with the several claims named above, having lived within a mile and a half of each of them for more than eight months, and he knows well their boundaries, and he knows that from May, 1904, to December 31, 1904, there was no work done on either of the said claims named above by the Whalen Consolidated Mining Company, or any agent or stockholder for the same, and such work could not have been done in that time without his knowledge."

Mr. Lay denies in his testimony that he ever had any negotiations with Mr. Wailes looking towards inducing him to relocate the claims of the Whalen Consolidated Copper Mining Company, but in a letter to Mr. Shaw, dated August 6th, 1905, he says:

"Don't do anything that will jeopardize my [interest] for yours are identical with mine—the plan of having Mr. Wailes was mine, and not Mr. Benson's, and you and the old stockholders of the old company will yet be taken care of as I promised you, if it takes all the stock I have."

In December, 1904, Lay told Shaw, according to the testimony of the latter, that he and Benson had decided to jump the property, that he had a good man in view whom he could trust, an old friend of his named Wailes. "I don't want a man," he said, "to jump the property, who, when the proper time comes to turn it over, will tell me to go to hell." In his letter of February 22, 1905, to Mr. Shaw, Lay says:

"Mr. Wailes has sent Mr. Leighton, in all, to be filed as the development work is done, 21 claims, 10 of which have been filed and recorded, and Mr. Wailes has them, and Leighton is to have the work done in the other 11, and at the proper time Mr. Wailes will deed them over."

It is also in evidence that in April, 1904, Mr. Lay requested Mr. Shaw to write the Grand Rapids stockholders in the company "that their

interest in the company was well taken care of by Charles Lay." Mr. Lay's own testimony, however, indicates clearly what his intentions were. He testifies:

"I meant that I wanted to defeat Mr. Davies in his judgment suit against the company. * * * I was a stockholder in the old company, and I didn't want to see Mr. Davies, who had been jumping this property and assisting in jumping it and bringing false claims against it, to get a judgment on it to get the advantage of it."

Mr. Shaw and Mr. Leighton, both of whom were stockholders in the company, had assisted Mr. Wailes to relocate the claims, and Mr. Benson furnished a portion of the money to pay for the relocation work. Mr. Benson at the time was one of the trustees of the Billings estate, which owned a large block of stock in the company, and, as trustee, held in his own name stock of the company. Mr. Lay himself was at the time the owner of some 22,000 shares of the stock.

It is difficult to escape the conclusion that the stockholders who had been most interested in doing the assessment work for the company in the three years previous to 1904, were also deeply interested in the relocation of these claims. It is equally difficult to escape the conclusion that the idea that the work performed on the three claims in 1904 was not annual labor, but was the work of a mere trespasser, was an afterthought, and that the whole scheme of forfeiture and relocation was devised by Mr. Lay, and other stockholders of the Whalen Consolidated Copper Mining Company, with Mr. Wailes in order to defeat the Davies judgment. It does not appear that there was any appeal from the judgment, or that any effort was ever made to set it aside. This court, therefore, can indulge no presumptions of any character whatever against that judgment.

Mr. Wailes testifies that in the fall of 1904 Mr. Lay wrote him stating that they were very much "up against it"; that the company had practically gone out of business; that they were afraid of losing the property; that there was a man in Chicago named Robert L. Benson, whom he thought would try and get hold of the property, and there would probably be something in it for Wailes if he could get in touch with Benson, put up some money with Benson, and get hold of the property. December 30, 1904, Wailes went to the mines by special train from Palisade—this train had previously been arranged for by Mr. Lay. Mr. Wailes also testifies that he had never seen the property before, knew nothing about it except from Lay's description, and the "main factor" inducing him to relocate the claims "was that Mr. Benson thought it was proper to put money into it." Wailes was on the ground at the very time that the execution to enforce the Davies judgment was being levied by the sheriff. He testifies that he "heard them talking of it in the camp." Mr. Shaw testifies that on Mr. Wailes' arrival at the mines December 30th, Mr. Wailes asked Mr. Lay, " 'What do you want of me, Colonel, to do?' He says: 'I want you to jump this property.' 'Well, now,' Mr. Wailes says, 'I am perfectly willing to help you in any manner I can.' " Mr. Lay replied, "All I ask of you to do is to sign these papers that I have written out, put your foot on the property, and that is all." Wailes answered, "I am your man." Mr. Wailes then

signed the relocation papers, and employed Trimbath and Ollie Leighton to do the discovery work, and Leighton to post the notices on the mine. Mr. Shaw also testifies that on the same evening he heard Lay say to Wailes, "Now, Wailes, after you do that, Mr. Benson and I have talked it over, and you will get a good block of stock for your trouble." The following day, December 31st, Wailes left the mines, and, so far as the evidence shows, he has never returned. These facts lead me to conclude that Mr. Wailes was not only acting a part which had been assigned to him in this scheme, but that he knew the scheme was intended and designed to transfer the mining claims of the Whalen Consolidated Copper Mining Company to complainant Wailes, in order to hinder, delay, and defeat the judgment of the defendant Davies. But, whether he did or not, Wailes had sufficient knowledge to put a prudent man upon inquiry. Possessed of this knowledge, he was bound to inquire, and, if he neglected to do so, he is bound by such knowledge as he might on inquiry have discovered. Walker v. Collins, 50 Fed. 737, 1 C. C. A. 642; Brittain v. Crowther, 54 Fed. 295, 298, 4 C. C. A. 341; Greenwell v. Nash, 13 Nev. 287.

The statutes of Nevada relating to fraudulent conveyances of real estate, provide, in substance, that all conveyances made with intent to hinder, delay, or defraud any creditor or creditors of the vendor, are, as against such creditor or creditors, absolutely null and void. Cutting's Comp. Laws Nev. § 2708; Thomson v. Crane (C. C.) 73 Fed. 327, 328. Such conveyances are fraudulent in favor of the creditor and as against the purchaser, even when the latter has paid full consideration for the property, provided he had actual or constructive knowledge of the fact that the property was being transferred to hinder, delay, or defraud creditors of the grantor. Means v. Montgomery (C. C.) 23 Fed. 421; Means v. Dowd, 128 U. S. 273, 9 Sup. Ct. 65, 32 L. Ed. 429; Bank v. Trebein, 59 Ohio St. 316, 325, 52 N. E. 834; Ivancovich v. Stern, 14 Nev. 341, 347. This statute did not establish a new rule; it was merely expressive of the ancient doctrines of the common law, which, when applied to such transfers of property, declared them fraudulent. For, as Lord Mansfield, in speaking of the early English statutes on this subject, said:

"The principles and rules of the common law, as now universally known and understood, are so strong against fraud in every shape that the common law would have attained every end proposed by the statutes." Cadogan v. Kennett, 2 Cowp. 432.

The law and the statute prohibit every disposition of property which is designed and intended to hinder, delay, or defraud creditors. It is immaterial by what instrument, proceedings, or means the alienation or transfer may be accomplished. That which cannot be done directly cannot be done indirectly. A court of equity will cut its way through the process by which a debtor's property was transferred, no matter how novel and unprecedented the arrangement may be, and lay its hands upon the fraudulent purpose which was designed to be accomplished, if such a purpose appears, and declare the transaction fraudulent. Bank v. Trebein, 59 Ohio St. 316, 325, 52 N. E. 834. Here there was no formal conveyance of the mines by cor-

porate action. Wailes knowingly acquired a title to the property. which had been owned by the corporation, through the negligence of the corporation itself, the connivance of a portion of its stockholders, and with the active assistance of others. The purpose was clearly fraudulent. The complainant now comes into a court of equity asking that his title to the mines so acquired be confirmed and established, and that the title of defendant Davies be adjudged invalid and void. The maxim "that he who comes into equity must come with clean hands" forbids the complainant any relief in this court.

Let a decree be entered dissolving the injunction heretofore issued in this suit, and awarding defendants their costs.