### GIRD et al. v. CALIFORNIA OIL CO.

(Circuit Court, S. D. California. February 26, 1894.)

#### No. 302.

1. MINING—LOCATION OF CLAIM—NOTICE—RECORDING.
    Under Rev. St. § 2324, and the rules of a certain mining district passed pursuant thereto, one desiring to locate a mining claim was required to post thereon a notice of his location, attested by a claim owner within the district, and to have such notice recorded so as to show the name of the locator, date of location, and a description of the claim by reference to some natural object or permanent monument, sufficient to identify it. *Held,* that it was not necessary that the record of the claim should be an exact and literal copy of the notice posted on it.

2. SAME—NOTICE—POSTING.
    A notice of location of a mining claim, required by rules of the mining district to be posted on the claim, was put in a tin can, which was placed on a shelf in a rock mound on the claim more than two feet high, the corners of the claim being marked by similar mounds. *Held,* that this was a sufficient posting.

3. SAME—DESCRIPTION—UNITED STATES SURVEYS.
    A notice of location of a mining claim, required by rules of the mining district, referred to subdivisions of a United States survey for the boundaries of the claim. It was shown that a surveyor had been deputized to make this survey, and that he returned field notes and a map to

the land office, which map was approved by the land department; but that the commissioner, upon information tending to show that the survey was not made in the field, suspended this approval, and ordered an investigation. *Held*, that the notice was sufficient, for the map may be referred to for a description of the claim, whatever may be the ultimate fate of the survey.

4. SAME—PLACER LOCATION—AREA.

Under Rev. St. § 2331, which provides that no placer location "shall include more than twenty acres for each individual claimant," a claim located by three persons must be limited to said 20 acres when it appears that they are all in the employ, and acting in the interest, of a single company.

5. SAME—WORK DONE—CLAIMS HELD IN COMMON.

Rev. St. § 2324, provides that on all placer mining claims located after a given date, and until a patent has been issued, "not less than $100 worth of labor shall be performed or improvements made during each year; but where such claims are held in common, such expenditure may be made upon any one claim." *Held*, that the work required must have been done with a view to prospect or develop the claim; and, in order that work done on one may inure to the benefit of another, held in common with it, the claims must be contiguous.

6. SAME—WORKING OIL.

For the purposes of this section, work done and expense incurred in the general development of an oil-bearing district, embracing many distinct claims held by the same owners, whatever its amount, can only inure to the benefit of claims contiguous to these operations, notwithstanding that it constitutes the most economical and practical mode of working the oil, and may ultimately result in extracting the oil from all of the several claims.

Action by Richard Gird and J. C. Udall against the California Oil Company to determine conflicting claims to certain mining locations.

Minor & Woodward and Edward Lynch, for plaintiffs.

John D. Pope, for defendant.

ROSS, District Judge. The record in this case is a very voluminous one, and has been carefully examined and considered. The premises in controversy are oil-bearing lands, the government title to which, under existing laws, can alone be acquired pursuant to the provisions of the mining laws relating to placer claims. The defendant, California Oil Company, claiming to be the owner of a placer mining location called the "Razzle Dazzle," made application to the register and receiver of the United States land office at Los Angeles, in which district the land is situated, for a patent, against the issuance of which the plaintiffs, Richard Gird and J. C. Udall, filed a protest in writing, claiming that 17 5-10 acres of the Razzle Dazzle location are embraced by two previous mining locations, called, respectively, the "Whale Oil" and "Intervenor No. 3," of which they are the owners; and thereupon, within the time prescribed by section 2326 of the Revised Statutes, and pursuant to its provisions, the contestants commenced the present action in the superior court of Ventura county, of this state, to determine the conflicting claims of the respective parties to the disputed premises, from which court the action was, on motion of the defendants, transferred to this court. The proceedings here are purely statutory, and but a continuation of the contest that arose in the land

office (Wolverton v. Nichols, 119 U. S. 488, 7 Sup. Ct. 289; Doe v. Mining Co., 43 Fed. 219); and the object of the action being the determination of the question which, if either, of the applicants is entitled to receive the government title to the disputed premises, each of the parties is necessarily an actor, and must establish his claim by proof.

The ground in controversy is situate in the county of Ventura, and within the Little Sespe petroleum mining district. That district was not organized until after the passage of the act of congress of May 10, 1872, which provides, among other things, as follows:

"The miners of each mining district may make regulations not in conflict with the laws of the United States, or with the laws of the state or territory in which the district is situated, governing the location, manner of recording, amount of work necessary to hold possession of a mining claim, subject to the following requirements: The location must be distinctly marked on the ground so that its boundaries can be readily traced. All records of mining claims hereafter made shall contain the name or names of the locators, the date of the location, and such a description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim. On each claim located after the tenth of May, eighteen hundred and seventy-two, and until a patent has been issued therefor, not less than one hundred dollars worth of labor shall be performed or improvements made during each year. * * * But where such claims are held in common, such expenditure may be made upon any one claim; and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location * * * ." Rev. St. § 2324.

Upon the organization of the Little Sespe petroleum mining district, which occurred April 27, 1878, J. C. Udall was elected recorder, and W. Roberts, J. F. Dye, and E. G. Sobey a road committee for the district. On May 4th following, by-laws were adopted, including, among others, the following:

"Section 1. Any one locating a claim or association of claims must show the notice duly posted on the claim, also the corners of the claim, to a witness, who must be a claim owner in the district, who will sign said notice, also a copy of the same to be given the recorder for recording. Sec. 2. No claim shall be recorded until at least three corners are set. When a corner of a claim is designated by a stake, it must be at least three feet high. Mounds of rock for the same purpose shall be two feet high. When a corner cannot be set, a witness post or mound must be set as near to it as possible on the line of the claim, and marked in same fashion as referred to in the location notice. Sec. 3. All claims must be recorded in the district within thirty days from the date of location. * * * Sec. 8. The necessary annual work to be done or expenses made on any claim in this district may, at the option of the claim owner or owners, be done on any road in the district designated by the road committee, the course of which shall be laid out by said committee. Sec. 9. A claim owner shall be entitled to work on any part of such road nearest to his own claim for which he is doing work. Sec. 10. Two members of the road committee at least must locate the course of roads. Their decision shall be final. Sec. 11. The time employed by the road committee laying out course of roads, or in showing claim owners where to work on the road, shall account for work done on any claim or claims of theirs they may designate to the recorder. * * * Sec. 13. The recorder shall file for record all claims duly certified to, and shall keep the same on file for the period of nineteen days, which shall be considered duly

recorded unless set aside by satisfactory proof being shown of a prior location in accordance with these laws. At the expiration of nineteen days, he shall proceed to record the same on the presentation of the proper fee. Sec. 14. The recorder shall issue a certificate for the assessment or necessary annual work done on any claim or association of claims, on being presented, before the end of the year, with a certificate, signed by the president or two members of the road committee, that such work has been done by or for any claim owner on his or their claims, provided said claim is entered on the books of the district; otherwise, the claim shall be open to location. Sec. 15. The road on which the annual work for claims is to be done in the district commences at the mouth of the Little Sespe creek; thence by way of the Los Angeles claim, taking the most practical route to Tar creek. * * * Sec. 20. The recorder shall keep a book of record of claims, also a book of record of assessment work, which shall be open at all reasonable times for inspection, and at no time to be taken out of the district."

At the fourth annual meeting of the claim owners of the district, held April 27, 1882, the following resolution was unanimously adopted:

"That all claims situated in this district that have been, or at any time hereafter shall have been, duly represented in accordance with the by-laws of this district for the period of four years from the date of their location, shall not be liable to relocation, or required to pay any further assessment under the laws of the district, subject only to the mineral law of the United States, passed May 10, 1872, and its amendments; this amendment to the laws of the district to take effect thirty days after its publication or posting in the local land office in which this district is situated."

At the sixth annual meeting of the claim owners of the district, held April 28, 1884, it was—

"Voted, that the by-law requiring annual meetings be changed and amended to holding meetings once in four years, dating from the 1st of January next, requiring the next meeting to be held on the 1st day of January, 1889. (2) Voted, that a road overseer be appointed for the district, whose duty shall be to oversee and direct the making and repairing the roads in the district, as laid out and approved by the road committee. (3) Voted, that J. C. Udall be the recorder of the district for the above term of four years, and until his successor is duly qualified. (4) Voted, that J. F. Dye, H. Haines, and J. C. Udall be the road committee for the district for the above term of four years. (5) Voted, that J. C. Udall be the road overseer for the district for the term of four years. * * * (8) Voted, that for the next four years from date all of the claims situated above and between the Los Angeles claim and Squaw flat be held responsible to the overseer for their equal proportion of the expenses of making and maintaining the roads in that part of the district. (9) Voted, that J. C. Udall, the overseer, have power, and is hereby delegated the power, to sell any claim, or sufficient portion thereof, to the highest bidder, for cash, to pay said proportional expenses, "the owner of which, after being duly notified by publication or otherwise, refusing to pay his or their proportions or shares of said road expenses."

The rules so adopted by the miners of the district, except where in conflict with some law of the United States or of the state of California, being authorized and sanctioned by express statutory enactment, are, where in force, as valid and binding as if they were a part of the statute itself. It will be seen that by the first local rule respecting the location of claims the locator is required to post a notice on the claim, and to show it, together with the corners of the claim, to a witness, who is required to be a claim owner within the district, who must sign the notice as a witness, a copy of which is required to be given to the recorder for recordation. There is nothing in these requirements in conflict with any of the pro-

visions of the statutes of the United States or of the state of California, but they are subject to the provision of the former that the location must be distinctly marked on the ground, so that its boundaries can be readily traced. The act of congress does not itself require a mining claim to be recorded (Jupiter Min. Co. v. Bodie Con. Min. Co., 7 Sawy. 96, 11 Fed. 666), but the local rules of the district in question declare that all such claims shall be recorded with the recorder of the district within 30 days from the date of location. The local rules do not prescribe what the notice shall contain, but the act of congress of May 10, 1872, declares that—

"All records of mining claims hereafter made shall contain the name or names of the locators, the date of the location, and such a description of the claim or claims, located by reference to some natural object or permanent monument, as will identify the claim."

We see, then, that one of the essentials to a valid location within the Little Sespe petroleum mining district is the posting by the locator of a notice of location on the claim, signed also by a witness who is himself an owner of a claim within the district, and that such notice be recorded with the recorder of the district within 30 days after the making of the location; which record shall contain the name or names of the locators, the date of the location, and such a description of the claim or claims located, by reference to some natural object or permanent monument, as will identify the claim. The Whale Oil claim, which embraces almost all of the ground in controversy between the parties, was located July 15, 1878, by L. D. Gavitt and William Dryden, to whose interest Udall and Gird succeeded prior to the execution of the leases hereinafter mentioned, and the claim duly recorded; and this record constitutes the first ground of objection made by the defendant to the Whale Oil location. As contained in the records of the district, the description of that claim is as follows:

"Com'c'g at a point on Boulder creek, a tributary of the Sespe, at a point where a continuous ledge crosses said Boulder creek, and more particularly where the stream of water crosses the said ledge & has a fall of some 10 feet at a mark ⚲ cut into the ledge; running thence west 16 2-5 chs. to mound of rocks, said last-mentioned line being 10 chains north of oak tree on which is posted notice of Oil Spouter claim [said tree being the S. W. corner of said last-mentioned claim], running thence north 15 chs. to mound of rocks; thence east 26 2-3 chs., crossing Boulder creek at 20 chs. at falls, & marked ⚲ to accessible bluff; thence S. 15 chains to laurel tree, 4in. in diameter, marked ⚲; thence west 10 chains to point of beg. Cont'g 40 acres of land, situated in the Little Sespe petroleum mining district, Ventura Co., Cal., and known as the Whale Oil Claim. July 15, 1878."

In the record the words in brackets, "said tree being the S. W. corner of said last-mentioned claim," were erased, from which circumstance it is earnestly contended that the notice as recorded could not have been a copy of the notice as posted on the claim, but was written by the recorder Udall "to suit himself." It is said that, if the recorder was copying from a written notice into the book of records, he could not have inserted so many words not in the writing from which he was copying. It is not probable that he would; but by no means impossible. The recorder was a man then well advanced in years, and does not appear to be one of much edu-

cation, and, as he then had no interest in the Whale Oil claim, and did not acquire any for a long time afterwards, it is not possible to discern any motive on his part to make a false or fraudulent record. Moreover, it is not necessary that the record of the claim should be a literal and exact copy of the notice posted on it. The record of a mining claim, when one is required, is intended to contain a more exact and specific description of the claim than the notice posted upon it. This is clearly shown by the circumstance that the statute does not require any notice to be posted or recorded, but leaves the regulation of that matter to the miners of the district, subject, however, to the provisions that, if such record be required, it shall contain—

"The name or names of the locators, the date of the location, and such a description of the claim or claims located, by reference to some natural object or permanent monument, as will identify the claim."

In speaking of the distinction that exists between the notice posted on the claim and the statutory requirement respecting the record of such notice, the supreme court of Nevada, in Gleeson v. Mining Co., 13 Nev. 465, said:

"There can be no question that the original paymaster notice was all that the law requires. The only objection to it is that it did not contain in itself a description of the claim by reference to some natural object or permanent monument. It was not necessary that it should. It is only the record of the claim that is required to contain such a description; and there are excellent reasons for making the distinction between the notice and record in this particular. A notice is generally, and for safety ought always to be, posted immediately upon the discovery of the vein, before there is any time to survey the ground, and ascertain the bearings and distances of natural objects or permanent monuments in the neighborhood; and, besides, the claim referred to by the notice is always sufficiently identified by the fact that it is posted on, or in immediate proximity to, the croppings. A notice claiming a location on 'this vein' has only one meaning. But the notice is exposed to the danger of removal by adverse claimants or destruction by the elements, and for permanent evidence of the location its record is provided for. The record, if it consisted of a mere copy of the notice, would not identify the claim, and there would be an opportunity, as well as a temptation, to the locators, upon the discovery of a more valuable mine in the vicinity, to prove, by perjured witnesses, that their notice was posted on that mine. The floating of claims was by no means an infrequent occurrence prior to the act of 1872, and, if such attempts were seldom successful, they were always vexatious, and often the means of levying a heavy blackmail. It was on this account that the record (not the notice) was required to contain 'such a description of the claim or claims located, by reference to some natural object or permanent monument, as will identify the claim.' Rev. St. § 2324. It is a sufficient compliance with this provision of the law if the description of the locus of the claim is appended to the notice when it is recorded."

The purpose of the marking of the boundaries of the claim, hereafter referred to, and of the record of the location, are further stated by the supreme court of Colorado, in the case of Pollard v. Shively, 5 Colo. 317, as follows:

"Marking the boundaries of the surface of the claim as required by statute is one of the first steps towards a location. It serves a double purpose; it operates to determine the right of the claimant as between himself and the general government, and to notify third persons of his rights. Another seeking the benefits of the law, going upon the ground, is distinctly notified of the appropriation, and can ascertain its boundaries. He may thus make his own location with certainty, knowing that the boundaries of the other

cannot be changed so as to encroach on grounds duly appropriated prior to the change. The prevention of fraud by swinging or floating is one of the purposes served. The record also serves a double purpose. As between the claimant and the government, it preserves a memorial of the lands appropriated after monuments, in their nature perishable, are swept away. It also supplements the surface marking in giving notice to third persons."

It abundantly appears from the testimony that the description of the Whale Oil claim as recorded is sufficient for the identification of the boundaries as claimed by the plaintiffs. Indeed, this is not denied by counsel for defendant.

But it is further contended on the part of the defendant that no monuments were established, either on the Whale Oil or Intervenor No. 3 claim, as required by the rules of the district at the time of their location; that no notice was posted on either of the claims, as required by the rules; that, if the monuments were erected and notices posted, they were not kept up so as to preserve the validity of the locations, and that no work was done on either of the claims during any year since they were located. The Whale Oil, as has been said, was located July 15, 1878, by L. D. Gavitt and William Dryden. J. F. Dye was then living on the Kentuck claim, of which he was the claimant. During the preceding May, a claim called the "Oil Spouter" had been located by A. W. Potts and Alfred James, the notice of location of which was posted on an oak tree situated in Boulder canon above its junction with Sespe creek. Dye suggested to Gavitt and Dryden, who were visiting him, that they locate the ground claimed as the "Whale Oil," and they concluded to do so. Early in the morning of the day the location was made, Gavitt prepared a rope to correspond with a chain, with which to measure the distances, and Dye pointed out to him the oak tree on which the Oil Spouter notice was posted. From that tree Gavitt, assisted by the recorder, Udall, measured up Boulder canon 10 chains, which was the width of the Oil Spouter claim. At this point, which was on the northerly line of the Oil Spouter, there was a ledge of rocks and a waterfall of 8 or 10 feet, and this ledge was selected as the starting point of the Whale Oil claim. The ground there, and, indeed, the entire territory included within the district in question, is extremely rough and mountainous; so much so that Gavitt had great difficulty in establishing the corners of the Whale Oil claim, one of which it was necessary to fix by means of a witness stake. The witness Udall, by reason of his age and the roughness of the ground, was unable to go with Gavitt along the lines of the claim, but he saw Gavitt traversing them and erecting the monuments, who pointed them out to the witness, including the witness stake to mark the northeast corner, which could not be reached by Gavitt because the ground at that place is almost perpendicular. Gavitt worked several hours in thus marking the boundaries of the Whale Oil claim, and the notice posted by him on it was so exact and specific that the surveyors who were witnesses for the defendant on the trial of this case had no difficulty in finding the lines of the claim from the description given in the notice. At at least two of the corners of the claim they found a pile of rocks still existing, though they were not then two feet high, as required by the local rules. Nor is there any direct evidence that

any of the monuments were ever of the exact height prescribed by the rules of the district. But Gavitt, the man who erected them, was dead when the evidence was taken, and Udall, the only other witness to the building of the monuments, was unable to see, from the position he occupied, the height of them. Photographs introduced in evidence show that the locus in question is but a mass of boulders and rocks, broken and otherwise. Apparently they were the only things out of which the monuments could have been built, and as Gavitt was seen by Udall at work building them, and as he was engaged in making the location long enough to have built the monuments the required height, and as after the storms of 14 years, which the evidence shows to be heavy in those mountains, some of them still stand at a height of seven or eight inches, I think the court is justified in finding that, as originally constructed, they answered the requirements of the local rules.

The evidence in respect to the location of the Intervenor No. 3 claim, which covers a small strip of the disputed ground, is very different. That claim adjoins the Whale Oil on the east, and is claimed to have been located March 6, 1885, by the plaintiff Udall. The notice of location, as recorded in the records of the district, is as follows:

"Intervenor No. 3 — Lo

"Notice is hereby given that I the undersigned have this day located & claim 20 acres of this oil land for an oil claim to wit commencing at the northeast corner of the Oil Spouter claim running thence north 15 chs. to the northeast corner of Whale Oil claim thence east 20 chs. thence south 15chs to the northeast corner of the Intervenor claim thence west on the north line of the Intervenor claim 20 chs. to place of beginning, contang 20 acres to be known as the Intervenor No 3 J. C. Udall

"Little Sespe P M District Mar 6th 1885 at 10 a. m.

"Recorded Mar 12th 1885                                     J. C. Udall
                                                                            "Recorder.

"Witness Mason Bradfield."

Although the notice purports to have been witnessed by Mason Bradfield, Udall himself in his testimony admits that Bradfield did not in fact witness the posting of the notice on the claim, nor did he (Udall) ever point out to him its boundaries, nor was Bradfield a claim owner within the district, but that he (Udall) signed Bradfield's name to the notice, and entered it in the record a long time after the pretended location. In none of these particulars did the locator conform to the requirements of the local rules. Besides, not only does the testimony of the very man who claims to have made the location fail to show the proper marking of the boundaries of the claim on the ground, but it is perfectly apparent therefrom that they were not so marked as that the boundaries of the location could be readily traced. The circumstance that the ground was extremely rough and mountainous did not relieve the locator of the obligations imposed upon him by the law. It is plain that the pretended location of the Intervenor No. 3 claim was invalid from its inception, and it need not, therefore, be further considered. The notice posted upon the Whale Oil claim remained so posted some months. Udall testifies that he saw it on the tree several months after it was put up, but never saw it afterwards, and there is no other evidence

that it was ever afterwards seen. It was probably destroyed by the elements. Nor is there any evidence that any of the monuments of the Whale Oil claim were kept up or rebuilt. It is not contended by the defendant that a location, valid when made, is lost by the temporary destruction of a notice or of monuments, especially where such destruction occurs without the fault of the owner; but it is contended that, as one of the purposes of the requirement that the locator shall so mark out his claim as that its boundaries may be readily traced is for the guidance and protection of other miners, a location thus valid cannot be maintained for a long series of years, without actual possession, unless the boundaries are kept so marked as that they can be readily traced. This question need not be decided, because of the view I take respecting the annual expenditures required by law to be made upon all claims prior to the issuance of a patent therefor. As has been seen, the requirement of the statute is "that on each claim located after the tenth of May, eighteen hundred and seventy-two, and until a patent has been issued therefor, not less than one hundred dollars worth of labor shall be performed or improvements made during each year," provided that, "where such claims are held in common, such expenditure may be made upon any one claim." The statute further provides, as appears from the citation already made, that—

"Upon a failure to comply with its provisions, the claim or mine upon which such failure occurred shall be open to re-location in the same manner as if no location of the same had ever been made, provided, that the original locators, their heirs, assigns or legal representatives, have not resumed work upon the claim after failure and before such location."

From time to time after the organization of the Little Sespe petroleum mining district, a large number of claims were located within its limits. In 1878 a well was commenced on the Kentuck claim, and sunk until oil was reached. Shortly afterwards, two wells were sunk on the Los Angeles claim, at a cost of about $60,000. In those days the difficulties of operating in the district were great, and the value of the territory had not been demonstrated. The result was that the locators began to move away, and by 1882 no one remained there as a permanent resident but the recorder, Udall. He remained and, personally and by employes, did more or less work on the roads, and sought to interest capitalists in the territory. By degrees he acquired a large number of claims in the district, in which, through him, the plaintiff Gird subsequently acquired an interest; and those two persons—Udall and Gird—thereafter, by written instrument under date January 19, 1886, and in which L. D. Gavitt, Edward Roberts, and E. G. Sobey joined as lessors, leased, upon certain terms and conditions not here necessary to be stated, for the period of 99 years, to Lyman Stewart, Dan McFarland, and W. L. Hardison, 60 mining locations within the district in question. This lease, with the consent of the lessors, was subsequently assigned to the Sespe Oil Company, a corporation, to which corporation Udall and Gird, by a subsequent lease, of date May 14, 1887, leased, for a similar period of 99 years, and upon similar terms and conditions, 20 other mining claims in the Little

Sespe petroleum mining district. The 80 mining locations so leased embrace in the aggregate between 8,000 and 9,000 acres of land, and are widely scattered over the territory, which is many miles in extent, and through which run many mountain ranges and precipitous canons. Shortly afterwards, the defendant, California Oil Company, succeeded to all of the lessees' rights under these leases. Among the claims so leased were the Whale Oil and Intervenor No. 3. These 80 locations, the plaintiffs contend, constitute a consolidated claim, the working of which could be best done by one agency and pursuant to one general system, the expenditures in pursuance of which could be legally and properly proportionately applied to the respective claims included within the so-called consolidated claim. If this can be legally done, it is quite manifest that 80 locations, embracing more than 8,000 acres of land, would not necessarily constitute the limit, but that the system may as well embrace every claim within the district, and thus an entire district be acquired by one agency pursuing a general system of development of the whole, and making annual expenditures equal in amount to the aggregate required by law to be made or performed upon the separate and independent locations. It is endeavored to sustain this position upon the theory that, as it is the policy of the law to encourage the greatest and most economical development of the mineral lands, it encourages such consolidation of ownership and operation of claims "where all of the mineral can be extracted from a large body of land more economically under one ownership, one system of management, one combined operation, than by the diverse and antagonistic operations of many claims." And a great deal of testimony and other evidence was introduced to show that the nature of, petroleum and the geological structure of the country comprising the Little Sespe petroleum mining district, and the effective drainage power of an oil well, are such that all of the locations can not only be best worked by one system, but that it is almost necessary that they should be so worked.

It is undoubtedly true that petroleum, with its natural gas, unlike other mineral deposits, is movable by virtue of its own inherent force, as well as by virtue of its liquid character, and that this gas may be, and is, greatly assisted by pumps. The evidence shows, too, that, if fresh water gains access to the oil rock, it will drive out of the rock all of the gas and oil, and will do this for great distances. The evidence of Mr. Minor and of other witnesses shows that many fine wells in Pennsylvania have been ruined from this cause by neglect or design. Their evidence also shows that there it was common for unscrupulous persons to bore wells on the margin of their own holdings for the very purpose of thereby drawing oil from their neighbor's premises. But, as the normal condition of petroleum is one of repose, and not of motion, and it belongs to the rock in which it is embedded, it would seem to be very clear that the only difficulty in the way of preventing the recovery by the owner of the oil so abstracted would be the difficulty of making the necessary proof. But the fact that an oil well will drain oil from adjacent ground for very considerable distances, and the further fact that

there is always danger of fresh water getting into the well and destroying the producing capacity, not only of that particular well, but also of neighboring ones, are strongly relied upon to sustain the contention that the 80 locations claimed by the plaintiffs may, and ought to, be considered as one consolidated claim. In support of the same contention much evidence was also given tending to show that the stratification of the district in question is so irregular that to work it judiciously and profitably it is necessary to develop the territory by successive wells, or, as expressed by some of the witnesses, "to feel one's way along." And it was also shown that, by machinery adapted to the purpose, a great number of pumps, operating as many wells, can be worked with one engine and steam plant, situated at a central point, and, by means of pumps and pipe lines connecting with the wells, the crude oil can be transported for long distances to reservoirs and to the refinery; and that one superintendent can as readily care for many miles of territory as for one claim, and that one man can operate an engine and boiler that will pump several wells, and that, by the use of a telephone line and telephones properly placed, the superintendent and foreman can direct the operation of their men, and care for the operation of a plant covering many miles of territory. And such, the proof shows, was the plan of operations adopted by the lessees of the plaintiffs, in the pursuance of which they have expended annually more than $8,000, and in the aggregate more than $300,000. All of this, no doubt, greatly conduces to the profits of the plaintiffs' lessees, and is very convenient. But I am unable to see that these facts at all answer the requirements of the law regarding the location and acquisition of placer mining ground, which is the same whether the mineral it contains be gold, silver, quicksilver, petroleum, or anything else, or the applicant for the government title be rich and able to conduct operations on a large scale, or poor and able only to make the annual expenditure of $100 in work or improvements. That expenditure, up to the time of the issuance of the government patent, is essential, subject to the provision contained in the statute that, where the "claims are held in common, such an expenditure may be made upon any one claim." In speaking of this statute, the supreme court, in Chambers v. Harrington, 111 U. S. 350, 4 Sup. Ct. 428, after referring to the local mining rules requiring annual work to be done in order to hold a claim, said:

"Congress, when it came to regulate these matters, and provide for granting a title to claimants, adopted the prevalent rule as to claims asserted prior to the statute; and, as to those made afterwards, it required $100 worth of labor or improvement to be made in each year on every claim. Clearly, the purpose was the same as in the matter of similar regulations by the miners, namely, to require every person who asserted an exclusive right to his discovery or claim to expend something of labor or value on it as evidence of his good faith and to show that he was not acting on the principle of the dog in the manger. When several claims are held in common, it is in the line of this policy to allow the necessary work to keep them all alive to be done on one of them. But, obviously, on this one the expenditure of money or labor must equal in value that which would be required on all the claims if they were separate or independent. It is equally clear that in such case the claims must be contiguous, so that each claim thus associated may in some way be benefited by the work done on one of them. The prin-

ciple is well stated by Judge Sawyer in the case of Mining Co. v. Callison, 5 Sawy. 439, Fed. Cas. No. 9,886. 'Work done,' he says, 'outside of the cl..im, or outside of any claim, if done for the purpose and as a means of prospecting or developing the claim, as in the cases of tunnels, drifts, &c., is as available for holding the claim as if done within the boundaries of the claim itself. One general system may be formed, well adapted and intended to work several contiguous claims or lodes; and, where such is the case, work in furtherance of the system is work on the claims intended to be developed.' "

In the case at bar, none of the work done or expenditures made by the lessees of the plaintiffs, relied on to sustain the claim to the Whale Oil, were done or made on any claim contiguous to it. It is true that the evidence shows that, prior to the making of the leases in 1886 and 1887, Udall from time to time, under and pursuant to the local rules of the district, did considerable work in building roads in the district, and on the road that led in the direction of the Whale Oil claim. But the local rules, in so far as they conflict with the act of congress are, of course, of no avail, and that, as has been repeatedly stated, requires an annual expenditure of $100 in work or improvements on each claim, provided that, where the claims are held in common, such expenditure may be made upon any one claim. But, to come within this latter provision, the claims so held in common must, as said by the supreme court in Chambers v. Harrington, supra, be contiguous, and the labor and improvements relied on must, as held in Smelting Co. v. Kemp, 104 U. S., at page 655, be made for the development of the claim to which it is sought to apply them; that is, in the language of the supreme court, "to facilitate the extraction of the minerals it may contain." This, I think, cannot be justly affirmed of any part of the large expenditures shown to have been made by the lessees of the plaintiffs in the development of some of the claims embraced by the leases, all of which are remote from, and none contiguous to, the Whale Oil. I have not overlooked the contention of plaintiffs' counsel that by the well the lessees of the plaintiffs commenced on the Kenyon claim they hoped and expected, in years to come, to draw the oil from the Whale Oil claim, which is distant from the Kenyon considerably more than a mile, and between which and the Kenyon is a mountain range. The time when this result might be reached was fixed by the plaintiffs' witness who advanced the theory at from 10 to 100 years. When to this is added the fact that the well that was thus expected to extract the oil from the Whale Oil claim was not commenced until 1891, which was after the location of the Razzle Dazzle claim, upon which the defendant relies, nothing more need be said to show that work upon the well upon the Kenyon claim cannot be counted to maintain the validity of the Whale Oil location.

It is further contended on the part of the plaintiffs that the failure to do the required annual work or make the required annual improvements on the Whale Oil claim was due to threats made by Dye to Udall, and by Bradfield to employes of the plaintiffs' lessees. The record does not sustain the contention. It seems that about 1886 Dye killed a man named Haines, and in 1888 he grossly insulted Udall, and threatened his life. The trouble between them grew

out of some matter connected with the prosecution of Dye for the killing of Haines. All of this was long after the making of the leases by Udall and Gird, which conferred on the lessees all the rights of the lessors in and to the leased premises for the period of 99 years, and by the terms of which leases the lessors were required to make the annual expenditures required to hold and perfect the respective claims embraced by them. Dye's threats against Udall had no application to the lessees of the plaintiffs. In respect to the alleged threats of Bradfield, the testimony shows that none were made by him, and that what was said by him to the employes of the plaintiffs' lessees had relation only to the Oil Spouter claim. For the reasons stated, I am of the opinion that the failure to do the required annual work or make the required annual improvements upon the Whale Oil claim is fatal to that location, and that the ground thereby covered became subject to relocation.

It remains to consider the Razzle Dazzle location, which was made December 6, 1890, and under and in pursuance of which the defendant asserts the right to a patent from the government. Mason Bradfield, George J. Henley, and John Thompson were the locators of this claim. It was witnessed by J. G. Barker. The location notice is as follows:

"Notice of Location of a Placer Claim.

"Notice is hereby given, to all whom it may concern, that Mason Bradfield George J. Henley and John Thompson citizens of the United States of America, over the age of twenty-one years, have this day located, under the Revised Statutes of the United States of America, chapter six, title thirty-two, the following described placer mining ground, viz. It being the north half of the N. E. quarter of the N. E. fractional quarter, and lot one of Sect. one, T. 4 N. range (20) twenty west S. B. M. and more fulley discribed as follows, beginning in the center of lot (6) six S. (1) one T. (4) four N. (20) R. twenty west S. B. M. at a monument of Stone's, running north twenty four (24) and 40-100 chains, to a monument of stones, thence east twenty (20) chains to a monument of stones, thence south twenty four (24) and 40-100 chains to a monument of stones, thence west twenty (20) chains to a monument of stones which is the place of beginning this claim contains fourty eight (48) and 90-100 acres of Pet. Oil & Brown Stone Mining ground situated in what is called the Little Sespe P. O. mining district, county of Ventura state of California.

"This claim shall be known as the Razzle Dazzle Placer Mining Claim, and we intend to work the same in accordance with the Laws of the United States of America.

"Dated on the ground this 6th day of December, A. D. 1890.

|  |  |
|---|---|
| | "Locators |
| "Attest | Mason Bradfield |
| "J. G. Barker | Geo. J Henley |
| "J. G. Barker | John Thompson" |

The notice was placed in a small tin can, and the can placed by the locators on a little shelf in a rock mound, more than two feet high, erected by them near a tree on the claim, and a copy of it filed for record with the recorder of the district December 24, 1890. The evidence shows that the corners of the claim were marked by large rock mounds, considerably more than two feet in height, and near the northeast corner a diagram was cut in the rock, and measurements given by which the claim could be easily identified. The evidence, I think, clearly shows that the boundaries of the claim were

so marked upon the ground as that they could be readily traced. It is said for the plaintiffs that this location did not comply with the local rules requiring the notice of location to be posted on the claim; that putting it in the tin can, and the can in the pile of rocks, was hiding, and not posting, it. I do not think so. As has been already said, one of the main purposes of the rule requiring the posting of the notice on the claim is for the guidance and protection of other miners seeking to locate claims. And it cannot be doubted that a miner traversing a mining region in search of mining ground who should see such a mound of rocks as usually marks a mining claim, with a tin can carefully placed in it, and who was seeking in good faith to inform himself, would fail to examine the contents of the can. The very fact that such a can was put in such a place would indicate to the miner that it was put there for a purpose, and that purpose the protection of a notice of information from destruction by the rains or from other causes. The objection made, in my opinion, is without merit.

It is further urged that the notice itself did not convey any information as to the boundaries of the claim, and this because it refers to certain subdivisions of a United States survey which, it is said, was never in fact made upon the ground. A portion of the township in which the ground in controversy is located was surveyed prior to the location of the Whale Oil claim, and thereafter one Collins was deputized to survey the remainder of the township. This survey Collins claimed to have made, and he returned to the land office field notes thereof and a map, which received the approval of the land department. Upon information tending to show that the pretended survey by Collins was not in fact made in the field, the commissioner of the general land office subsequently, to wit, July 15, 1885, suspended all entries of land embraced within it pending an investigation of the matter. But, afterwards, filings and entries were permitted and patents issued by the officers of the land department, based upon that survey. I agree with counsel for defendant, however, that it is immaterial in this proceeding what may be the ultimate fate of the Collins survey. If it should continue approved and valid, the Razzle Dazzle location conformed to it as required by the provisions of section 2331 of the Revised Statutes; and, if it should be set aside, the map of record in the land office may still be as well referred to for a description of the ground located.

It is further urged on the part of the plaintiffs that, independent of the Whale Oil location, the ground covered by the Razzle Dazzle location was not at the time open to location by Bradfield, Henley, and Thompson, because it was then in the actual physical possession of David H. Irland, who was then, by his employes, engaged in putting down a well upon it, and that Bradfield and Henley were estopped from claiming the ground; the latter for the reason, it is said, that he was in the employ of Irland, and the former upon the ground that Irland was holding under him. But these positions are without support in the record. The evidence, I think, shows that Irland himself was in the employ of the defendant oil company, and that the work that he was doing on the ground in question at

the time of its location was the defendant's work, and that the location made by Bradfield, Henley, and Thompson was in reality made for the defendant company, which, through mesne conveyances made almost immediately afterwards, acquired all of the rights therein of Bradfield, Henley, and Thompson. Irland never held under Bradfield any interest in the ground covered by the Razzle Dazzle location. He did hold a lease of the Oil Spouter claim from Dye and a man named Beattie, who had previously succeeded to Bradfield's interest therein. And in respect to the Oil Spouter No. 2 claim, which, it is said for the plaintiffs, covered a part of the disputed premises, and of which it is said Henley was one of the locators, it is enough to say that that pretended location was invalid because the notice of location was neither recorded nor witnessed as required by the local rules. It appears, however, from the notice of location that the Razzle Dazzle claim contains 48.90 acres of land. It is declared by the act of May 10, 1872, c. 152 (17 Stat. 91), and the provision was afterwards carried into the Revised Statutes, that no placer location "shall include more than twenty acres for each individual claimant." Sec. 2331, Rev. St. If Irland was in the actual possession, and working the ground for himself, and Bradfield, Henley, and Thompson were acting for themselves in making the location of the Razzle Dazzle on December 6, 1890, the location so made by them would be void, because, in that event, the location would have been made upon ground, not vacant and open to location, but upon ground in the actual and adverse occupancy of another. But, as already observed, I think the evidence shows that Irland, Bradfield, Henley, and Thompson were, in truth, all acting for the defendant company at the time of the location of the Razzle Dazzle claim, and therefore that the location should be considered and treated, not as made by the three individuals, Bradfield, Henley, and Thompson, but as made for and in the interest of the defendant company, and must, under the provision cited, be limited in amount to 20 acres of land. That defendant has expended upon the ground in question, annually since its location, much more than the amount required by the statute, and much more than the $500 required by statute to entitle the applicant to apply for and obtain a patent, clearly appears from the evidence. For the reasons given, I am of the opinion that the right of possession of the disputed ground, to the extent of 20 acres, is in the defendant, and that the plaintiffs have no right thereto. There will be judgment in accordance with these views, with costs to the defendant.